**Brenda BERKMAN, on behalf of herself and a class consisting of all similarly situated women, Plaintiff,**

v.

**The CITY OF NEW YORK; Edward Koch, individually and as Mayor of the City of New York; New York City Fire Department; Augustus Beekman, individually and as Fire Commissioner of the City of New York; New York City Department of Personnel; Michael Nadel, individually and as Director of Personnel of the City of New York; Thomas Roche, individually and as former Director of Personnel of the City of New York; Civil Service Commission of the City of New York, Defendants.**

**No. 79 C 1813.**

United States District Court, E.D. New York.

Dec. 8, 1983.

Women's Rights Clinic of The Washington Square Legal Services, Inc. and Debevoise & Plimpton by Laura Sager, Robert L. King, Jeffrey N. Drummond, New York City, for plaintiff.

Frederick A.O. Schwarz, Corp. Counsel of the City of New York by Judith A. Levitt, Elizabeth Dale Kendrick, Asst. Corp. Counsels, New York City, for defendants.

John F. Mills, Garden City, N.Y., for intervenor, Uniformed Firefighters Ass'n.

## MEMORANDUM DECISION AND ORDER

SIFTON, District Judge.

This action, brought pursuant to Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e *et seq.;* the Civil Rights Act of 1871, 42 U.S.C. § 1983; the fourteenth amendment to the United States Constitution; and Section 296 of the New York Human Rights Law (Executive Law), originally sought declaratory and injunctive relief and damages to redress alleged sex-based discrimination against plaintiff and the class she represents in connection with the physical test portion of New York City's Examination 3040 ("Exam 3040") for the entry level position of firefighter in New York City.

Plaintiff, Brenda Berkman, passed the written portion of Exam 3040, but failed the physical test portion, which she took on February 22, 1978. The class she represents consists of women who took the written portion of Exam 3040 and were alleged either to have taken the physical portion of Exam 3040 and failed it or to have been deterred from taking it as a result of sex discrimination by defendants. Defendants are the City of New York, its Mayor, the City's Fire Department and its Commissioner, the City's Personnel Department, its Director and former Director, and the Civil Service Commission of the City of New York. Appearing as intervenors pursuant to this Court's Order of April 10, 1981, are the Uniformed Firefighters Association ("UFA") and the Uniformed Fire Officers Association ("UFOA"), both employee organizations representing current job incumbents.

The trial of this case was conducted before the undersigned, sitting without a jury in the fall of 1981. In a decision of this Court filed March 4, 1982, 536 F.Supp. 177, the undersigned concluded that the physical portion of Exam 3040 discriminated against plaintiff and the class she represents on the basis of their sex. On March 25, 1982, an order was entered pursuant to that decision prohibiting further use of the eligibility list established pursuant to Exam 3040 except on a showing of compelling necessity, directing the preparation of a new physical exam that did not discriminate against women, and awarding plaintiff interim relief in the form of a directive that the City reserve entry-level firefighter positions for the hiring of up to 45 members of the plaintiff class who remained interested in pursuing a career as firefighters and were found to be qualified for the position.

The March 25 order directed the parties to attempt to agree upon a procedure for determining which members, if any, of the plaintiff class were qualified to become firefighters. Thereafter, on August 3, 1982, the undersigned approved an agreement between plaintiff and the City with respect to the form of qualifying interim test to be used to determine those members of the class who were entitled to appointment to the reserved positions.[1] Both the March 25 and August 3 orders were affirmed on appeal. *Berkman v. City of New York,* 705 F.2d 584 (2d Cir.1983).

The matter is presently before the Court on applications filed in September 1983 by the named plaintiff, Brenda Berkman, and one member of the plaintiff class, Zaida Gonzalez, both of whom passed the qualifying exam, were appointed firefighters, but

---

**1.** The form of the qualifying test was as follows:
Part I—Engine Simulation Subtest
  A. Hose Stretch: Candidate holds one length of 3½″ hose weighing 80 pounds and stretches it 145 feet.
  B. Hose Carry: Candidate picks up a folded 2½″ hose weighing 46 pounds and carries it from the building entrance to the fifth floor by way of the stairs.—Five Minute Rest.
Part II—Ladder Simulation Subtest
  C. Ladder Raise: Candidate raises a 20-foot ladder that weighs 58 pounds and is lying on the ground from the horizontal to the vertical position.
  D. Ladder and Stair Climb: Candidate climbs a pre-set supported ladder up to the second story and then enters the building through an open window, picks up an 8-pound mallet and a halligan tool, and runs up to the fifth floor.
  E. Forcible Entry: On the fifth floor, candidate hits a rolled 3½″ hose weighing 80 pounds that is placed at one end of a table and drives it 12½ feet to the other end of the table.
  F. Rescue Drag: Candidate drags a 145-pound articulated dummy from a position on the fifth floor to a door leading to the stairs.
In performing all tasks, candidates were to wear a 24-pound "Scott Pak" and full firefighter uniform.

were thereafter terminated at the conclusion of their probationary period. Both applicants seek reinstatement to the Fire Department on the grounds that their termination violated this Court's orders of March 25 and August 3, 1982, occurred as a result of retaliation against them for pursuit of their remedies under the Civil Rights Act of 1964, as amended, and because of discrimination against them on account of their sex.

A trial of the issues raised by these applications was held before the undersigned, sitting without a jury, in October 1983.

For the reasons set forth herein, the applications of plaintiff Berkman and class member Gonzalez for reinstatement are granted, and defendants are directed to reinstate both applicants to the Department, as probationary firefighters, fourth grade, with backpay and all benefits, including seniority, pension, and vacation benefits, that would have accrued to them had they not been terminated. What follows sets forth the findings of fact and conclusions of law which warrant this relief, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## DISCUSSION

█ As noted, both Berkman and Gonzalez took and passed the qualifying physical examination agreed upon between plaintiff and the City and approved by this Court in August 1982. Against a qualifying time set by the parties of 4 minutes, 9 seconds, Berkman performed the test in 2 minutes, 51 seconds—the third fastest time among the women taking the examination. Gonzalez performed the test in 2 minutes, 58 seconds, and was the fourth fastest of the women taking the examination.

Both Berkman and Gonzalez were appointed to the Fire Department on September 24, 1982, along with 39 other women who had taken and passed the qualifying exam. Following their appointment, both Berkman and Gonzalez were assigned for six weeks of training to the Department's Training Academy on Randall's Island. Both women received 3 "deficiency slips" during the course of their training, far fewer than those of most firefighters taking the course. Both were among the first 11 women graduating at the end of the course in October. (The other women qualifying for appointment were held back for additional training.) Both women were selected to demonstrate their skills at the ceremony marking their graduation from the Training Academy.[2]

Following their graduation from the Training Academy, both Berkman and Gonzalez were assigned as probationary firefighters, fourth grade, to engine companies. Berkman was assigned to Engine Co. 17 on the Lower East Side of Manhattan. Gonzalez was assigned to Engine Co. 60 in the South Bronx. Both women did well during the first seven weeks of their assignments and received satisfactory ratings on the first of four periodic evaluations prepared by the officers of their engine companies.[3] However, subsequent to a

---

**2.** In addition to this evidence of recognition by defendants of both Berkman's and Gonzalez' distinctive strength and ability among the women firefighters, Berkman was selected to try out a new physical examination developed by the City pursuant to this Court's order. She achieved the second highest score among those women trying out and, against a cutoff time of 7 minutes, performed the examination in 5 minutes, 33 seconds. Gonzalez was selected by the Department to demonstrate techniques of training for and taking the new examination in two Departmental films in February and July 1983, at a time when she was, according to defendants, demonstrating an almost total inability to perform as a firefighter.

**3.** Berkman's initial totally satisfactory evaluation was prepared by one of the same officers who later rated her unsatisfactory in subsequent evaluations following a March 1983 meeting between the Fire Commissioner and the captains of all companies to which women had been assigned at which the captains were told that the Commissioner was prepared to terminate women firefighters at the end of their probation if a written record of their deficiencies was established. Gonzalez was also initially evaluated satisfactory in all aspects of her performance by Lieutenant Robert Salardi, who had direct supervision over the group to which she was assigned within the engine company throughout her probationary period and who had the most

meeting in March 1983 between the Fire Commissioner and the captains of all companies to which women firefighters were assigned in which it was announced that the Department was prepared to terminate women firefighters with a documented history of unsatisfactory performance as probationers, each began to encounter the difficulties that eventually gave rise to these applications. Whether these difficulties arose as a result of retaliatory discrimination against them on account of their sex is the principal issue to be decided on these applications.

Having heard the evidence at trial, both from the terminated firefighters and from those whose evaluations led to their termination, much of which was conflicting, I am persuaded by a clear preponderance of the credible evidence that neither Berkman nor Gonzalez was given a fair opportunity to demonstrate her ability to become a firefighter. On the contrary, I conclude that the officers of the Department responsible for their training and evaluation instead deliberately set out to re-examine Berkman's and Gonzalez' physical capacities to be firefighters—a determination already made as a result of their successful completion of the qualifying exam. This violation of this Court's orders was, moreover, I find, visited on these two class members in retaliation for the prominent role both assumed in pursuing their rights under the Court's orders and because of intentional discrimination against each on account of their sex.

What is first of all apparent from the undisputed evidence introduced at trial is that the Fire Department failed lamentably to prepare its officers and members for the extraordinary task of integrating women into its previously all-male ranks. Indeed, the Department's efforts in this regard appear to have been by and large confined to a directive to install locks on bathroom doors in the firehouses to which women were assigned, as well as privacy screens for use around the women firefighters' bunks and lockers. Beyond these minimal efforts, the Department did little more than issue an ambiguous oral directive that the women be treated no differently from men—a directive which so far from stemming discrimination in fact acted affirmatively to encourage it.[4]

Apart from this directive, no written materials or oral directives were issued by the Commissioner or Chief of the Department to either officers or men concerning what problems to expect or how to confront them. Although possessed of brochures and a film on the subject of sex discrimination and aware of the availability of the technique of sensitivity training as a means of achieving successful integration, none was distributed or used. The Department's Equal Opportunity officer was given little, if any, role to play or duties to perform in achieving the successful integration of women into the Department. Even when specific instances of sexual harassment and discrimination were brought to the attention of the Commissioner by plaintiff and the leaders of another fraternal organization, the Vulcan Society, the Commissioner declined to issue directives calculated to halt or minimize them. Departmental investigations of such

---

extensive acquaintance with her performance as a probationer. Her subsequent evaluations were made by the captain of her company, who, according to his own testimony, never observed her performance at a fire. Lieutenant Salardi was not called as a witness by either side. The significance of this failure to call this available witness with regard to Ms. Gonzalez' performance as a probationer is discussed below.

4. A directive to treat each firefighter as an individual without regard for his or her sex would, as indicated in this Court's earlier opinion, have avoided the discrimination implicit in a di-

rective to treat women as if they were men. Women such as Berkman, who for cultural reasons have never before operated a power saw, or like Gonzalez, whose previous occupation was that of a modern dancer, are entitled to training which takes into account their previous experiences and backgrounds to the same extent that a physically qualified male firefighter would be entitled to training, taking into account aspects of his own cultural background which affected his ability to apply his strength and endurance to the peculiar tasks of fighting fires.

incidents were either terminated on the basis of evaluations of the conflicting statements of the immediate participants, without testimony under oath, or permitted to drag on without resolution as of the date of trial. Nothing was done to assure that the extraordinarily lax and generalized system of evaluating the progress of probationary firefighters was administered rigorously and concretely in the case of women probationers so as to avoid the introduction of prohibited discrimination in the evaluation and training to the women firefighters.[5] An institutionalized system of senior firefighters "hazing" probationary firefighters was permitted to operate unimpeded despite the obvious opportunities for sexual discrimination and abuse which such a system provided the women's all-male seniors. In the face of the unique forms of cooperative effort, joint social activity, and communal life developed in the City's firehouses in response to the unusual demands of the job, the Department did next to nothing to foresee and prevent retaliation and sexual harassment which was one obviously foreseeable response to the disruptions of everyday life in the workplace caused by women joining the fire force.[6]

As a result of this minimal effort on the part of the Department's senior officers, both Berkman and Gonzalez were subjected throughout their probationary period to extensive sexual abuse in the form of unimpeded hazing. In Berkman's engine company, crude sexual comments appeared regularly in the form of graffiti and cartoons containing blatant sexual mockery on the communal bulletin boards and living space of the firehouse. While Berkman's superior officers disclaimed knowledge of the pointed sexual innuendo of these efforts, many bordering on the obscene, their testimony on this point is incredible.[7] A bra marked with Berkman's nickname, a teeshirt mocking her, and crude graffiti questioning her sexual preferences and courage were claimed to have either escaped the attention of her superiors or to have been immediately removed without being observed by the officers in the face of credible testimony as to their continued display in the cheek-by-jowl living accommodations of the firehouse. In the case of Gonzalez, prophylactic devices and a wet vibrator were placed in her bed; her earrings, underwear, and badge were stolen from her locker; her helmet disappeared; and, on one occasion, she discovered that her air hose had been disconnected from her air tank. In addition, in Gonzalez' case, physical sexual molestation occurred and was tolerated, meriting separate discussion below. While it is not the point of the present applications for reinstatement to halt these practices in the Department, there is every reason to believe that the same discrimination that permitted these practices to occur and continue itself entered into the other more important mat-

5. Despite a graduated scale running from 1 to 10, each officer questioned on the subject testified that he had never, prior to the two applicants, given a probationer a rating less than a "5," which is explained on the evaluation form as indicating "satisfactory normal expected performance." No officer using the evaluation forms had ever received training or instruction in its use beyond the extraordinarily subjective instructions contained in the form itself.

6. What *was* done to foresee and prevent discrimination was done by and large by the rank-and-file members of the Department themselves with little assistance from their supervisors. In part these informal efforts of support came from Black and Hispanic firefighters and their leaders, drawing on their own experience with similar problems in the past. However, because the Department's senior officers did so little to foresee and forestall the reasonably foreseeable problems of integration, it is also reasonable to infer that extraordinary efforts on the part of other male firefighters in other houses throughout the City are responsible for the fact that most women firefighters, including many whose strength and endurance were not equal to that of Berkman and Gonzalez as measured by the qualifying tests, experienced less difficulty than they did in successfully completing the probationary period.

7. For example, the captain of Berkman's engine company claimed ignorance of the identity of the figures in or the import of a cartoon prominently posted in his firehouse depicting a women firefighter at a men's urinal, in the presence of a figure labeled Captain Mayerhoff, despite the fact that he only had one women firefighter in his company.

ters at hand, namely the training of the applicants and their evaluations.

Beyond this tolerance on the part of both applicants' superior officers for the day-to-day sexual harassment to which the applicants were subjected throughout their probationary period, each also met with extraordinary difficulties in achieving integration into the unique forms of communal living that are characteristic of the firefighters' workplace. Berkman's bed was not made by the firefighters assigned this task as part of their regular duties. She received little help on cooperative tasks in the firehouse. A meal prepared by Gonzalez was thrown into the garbage by the men in her firehouse. Both were, in the language of the Department, "put out of the meal," meaning that they were denied the opportunity to share in the traditional communal effort to use the cooking facilities of the firehouse to enjoy a common repast. Both found it impossible to arrange, on any consistent basis, "mutuals" —a system of work exchange developed over the years to accommodate firefighters' personal needs with the Department's system for assigning tours of duty. While defendants disclaimed any authority to interfere in these institutionalized forms of communal accommodation, it is clear from all of the evidence presented that the applicants' superior officers in fact possessed ample power to deal with the discriminatory and retaliatory animus behind these attempts to isolate the women firefighters.[8] In this connection, it is noteworthy that Berkman's commanding officer testified that he recognized she had been put out of the meals for going to Court to protect her rights. What is also clear from all of the evidence is that the minimal nature of the effort made by the Department in this regard itself had its origin in intentional retaliatory discrimination on the part of the applicants' superior officers. Further, as discussed below, it is clear that this intentional discrimination went beyond a failure to integrate the women into the workplace and, in fact, infected as well their evaluation and training to be firefighters.

Given the extraordinary laxness with which the City proceeded to integrate women into the ranks of its firefighters, it is only surprising—and testimony to the basic decency of the rank-and-file members of the Department—that more incidents of discrimination have not emerged.[9] What is not surprising is that two of the women most prominent in their roles as spokespersons for the class [10] were the ones who fell

---

**8.** For example, while Berkman was assigned to Ladder Co. 11, the lieutenant to whose attention it was brought that Berkman had been "put out of the meal" at that house simply refused to participate in the meal itself unless Berkman was included. The practice immediately stopped. On one occasion, by an appeal to headquarters, Berkman was able to arrange a "mutual" with herself by promising to make up a missed tour of duty later. Efforts to generalize this practice or to arrange for mutuals among women firefighters at different houses failed.

**9.** Among the items of relief sought by the applicants is the appointment of a Special Master to deal with all future incidents of harassment against women in the Department. However, the record of this proceeding does not, as of this point, establish the need for such far reaching intervention by this Court into the day-to-day operations of the Department. On the contrary, it appears from the trial record that Berkman and Gonzalez, because of their prominent roles in seeking integration into the Department, have been particularly the subject of discrimination in retaliation for their efforts. Should it appear in the future that the problems faced by the applicants herein are of wider scope, other remedies may, of course, be required. *Cf. EEOC v. Local 638,* 532 F.2d 821, 829 (2d Cir.1976); *see also, United States v. Local 638,* 360 F.Supp. 979, *injunctive decree reported at* 6 EPD ¶ 8716 (S.D. N.Y.1973), *aff'd subject to modification,* 501 F.2d 622 (2d Cir.1974); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 267 (5th Cir.1974), *cert. denied* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *United States v. Ironworkers Local 86,* 315 F.Supp. 1202 (W.D.Wash.1970), *aff'd,* 443 F.2d 544 (9th Cir.), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).

**10.** Berkman has been the sole named class representative in this litigation since its commencement in 1979. In addition, subsequent to her appointment as a firefighter, Berkman organized and became president of an employee organization representing female firefighters, the United Women Firefighters ("UWF"). In her role as class representative and president of the UWF, Berkman has been active as spokesperson for the women firefighters and has been recognized as such by the Department. She has com-

victims to what discrimination did emerge—discrimination which, I am persuaded, led directly to their termination.

Both Berkman and Gonzalez were purportedly terminated because of their failure to perform satisfactorily on three out of some twenty-six evolutions they were required to perform during a two-week re-evaluation of their firefighting performances at the Department's Training Academy following recommendations of their termination by their company commanders. While the Fire Commissioner, who made the final decision on termination, testified that he felt such a re-evaluation was necessary because he had earlier experienced at least one instance in which a company commander's evaluation of a female firefighter's performance was directly contradicted by a later re-evaluation at the Academy, it apparently did not occur to the Commissioner that discrimination by company commanders might result not only in biased evaluations, but might also have affected the underlying training in firefighting that the probationers were supposed to have been afforded during their first eleven months in the Department. In fact, while there is also reason to believe that the evaluations of Gonzalez and Berkman both by their company commanders and, indeed, during the re-evaluation process were infected by bias, what is most obvious is that both women were faulted for performances easily corrected by training which they were denied.

Since the women were never given an opportunity to train and overcome the deficiencies revealed in their re-evaluations and since it is clear that that opportunity was deliberately withheld from them by company officers intentionally pursuing an effort to prove that the women lacked the basic capacity to be firefighters, reinstatement with an opportunity for additional training in the area of their perceived deficiencies is necessary in order to permit them to demonstrate that they can perform competently in their intended careers.

Berkman was purportedly terminated because of a judgment reached by her supervising officers, later confirmed on re-evaluation at the Training Academy, that she was not performing at the end of her eleven-month probationary period as a firefighter should. Each of these evaluations was purportedly based on one or more incidents of unsatisfactory performance either in training exercises or in actual firefighting. Examination of these incidents makes apparent that they in no sense justify the conclusion reached.

*Power Saw and Bolt Cutter Incidents.* In March 1983, Berkman was detailed to Ladder Company 11 for training. The detail was unusual in the sense that it had not previously been a regular aspect of probationary firefighter training, and Berkman questioned the assignment both within the Department [11] and in papers filed with this Court.

plained on behalf of women firefighters concerning incidents of sexual harassment and concerning Departmental directives that she has perceived to be discriminatory against women. Gonzalez has been the subject of a full-length cover story on women firefighters published in *New York Magazine* in January 1983, which became widely known and the subject of debate within the Department generally and within her engine company in particular. In that article as well as in two confrontational television interviews which followed it, Gonzalez has appeared as a prominent spokesperson for the class in achieving integration of women in the Department.

**11.** Berkman's complaints within the Department led to the issuance of a charge of disciplinary infraction by her supervisors in the engine

company on the grounds that she had ignored the Department chain of command by questioning the reassignment of herself and other female firefighters to ladder companies during their probationary period at the battalion level without first raising the matter with her company commander. Berkman explained her approach to her battalion chief (who was located in the same firehouse as her company) as justified because she was questioning Departmental policy, not on her own behalf but on behalf of all female firefighters whom she represented as president of the UWF. The charge of violation of the chain of command was later withdrawn. In Gonzalez' case, an even more minor infraction—failure to bring in a medical report finding her fit to return to duty after a medical leave of absence before the day specified in the report as the one on which she would be fit to

Immediately following her brief detail to Ladder Company 11 and the meeting of captains of houses to which women had been detailed, referred to above, Berkman received an evaluation from her supervising officer which concluded "that her one short-coming is her insufficiency of upper body strength." The only incidents cited in support of this conclusion were that in "starting the power saw, FF Berkman has to slowly pull out the cord to release the compression, then make another pull in an attempt to start the saw." In addition, "[s]he also had trouble with the bolt cutter[; when] she could not cut the bow of a lock, another firefighter did it with relative ease." No mention was made in the evaluator's report of any deficiencies in other areas of ladder company work, including "transportation of the injured, forcible entry, overhauling, rope slide and lowering operations, fire escape operations, [and] roof operations" on which she was also trained during this detail.[12]

Testimony at trial established that Berkman's initial difficulties with the power saw stemmed from an almost total unfamiliarity with the operations of a hand held internal combustion engine started by turning it over by means of a cord pull. Nevertheless, after initial difficulties in operating the device relying only on the laconic explanation given her by the supervisor who later evaluated her, Berkman learned of a recognized technique approved at the Training Academy involving placing the piston in a position so that the initial forceful pull does not create compression in the firing chamber, but rather starts the engine turning on the piston downstroke. Once advised of this technique, Berkman thereafter employed it successfully and, according to the uncontradicted evidence, has never encountered difficulties in starting the saw or operating it since. The suggestion by her ladder company captain that the fraction of a second necessary to place the piston in the down-stroke position somehow disqualifies her for firefighting, much less demonstrates a disqualifying absence of upper body strength, must be rejected because the technique employed is not only tolerated but recommended by the Department as an acceptable one to insure that ignition occurs without unnecessary expenditure of energy. When re-evaluated on this tool at the Training Academy using the technique criticized by the ladder company captain, she started the saw on the first pull, and her performance was rated satisfactory.

The bolt cutter incident referred to by the evaluator also involved a one-time failure later corrected by training. According to Berkman's testimony, she was asked to use a bolt cutter to sever a lock and failed to do so when holding both handles of the bolt cutter horizontally each in one hand. A fellow firefighter then demonstrated to her the technique of placing one arm of the bolt cutter on the ground and using two hands and her body weight to sever the lock. Using this technique, she was successful and was never again unable to use the bolt cutter as required. When re-evaluated on this operation at the Training Academy, she used the tool successfully, holding the tool horizontally in both hands.

*Hose Nozzle Incident.* A third incident meriting detailed comment in plaintiff Berkman's evaluation report by her engine company commander, issued after the March 1983 meeting of company captains, was described in the evaluation report as follows: "Unable to remove FT–2 nozzle from hose bed—male counterpart remove[d] nozzle." As established by the evidence at trial, this comment again refers

proceed—resulted in a more serious charge, later reduced to a command discipline for which Gonzalez received the maximum sanction: loss of four vacation days, which deprived her of a planned trip to Hawaii.

**12.** At trial, the captain of the ladder company testified that Berkman had difficulty with handling the axe, maul, and the halligan while at the ladder company. No mention of these difficulties with these important firefighting tools appears in the captain's reports; and, in fact, and somewhat inconsistently, he described one fire at which Berkman used an axe effectively to gain forcible entry and experienced no difficulty in pulling ceilings and baseboards.

to a single incident occurring during Berkman's eleven months as a probationer in which she was directed to remove a nozzle from a hose on one engine in order to place it on a hose line to be stretched from a second engine. Despite having performed this simple task numerous times before without difficulty (the nozzles are required by the Department to be only hand tight), on attempting to unscrew the nozzle on this occasion, she discovered that she could not remove the nozzle by hand. She mentioned the difficulty to another firefighter and went to get a spanner to remove it. Before she could accomplish this task, the other firefighter removed the nozzle, apparently himself using a spanner.

Subsequent to this incident Berkman was criticized for the incident by her captain. The criticism was directed not at her failure to unscrew the overly tight nozzle, but rather for permitting another firefighter to perform a task assigned to her. The day following the incident, Berkman herself checked the nozzle to determine whether it was, as required by company procedure, only hand tight and discovered that, once again, someone had tightened it to such a degree that it could only be removed with a spanner. Thereafter, Berkman made it her practice each day on reporting to duty to check the nozzle to assure that the nozzle was only hand tight, as required by Departmental regulations.

*Hydrant Inspection.* Another incident providing a basis for her engine company commander's evaluation was described as follows: "She was unable to open two hydrants while performing hydrant inspection, but her male counterpart opened the hydrants." As established by the credible evidence at trial, this comment referred again to one incident during one of three tours of hydrant inspection performed by Berkman during her eleven month probationary period. During the course of the day's operation, Berkman single-handedly opened some 15 hydrants without difficulty as she did on subsequent tours. The techniques available to open hydrants that become rusted shut, in part because of a failure, at least in the area to which Berk-

man was assigned, to follow Departmental requirements that the threads on hydrant caps be greased, include initially the use of a wrench. When that technique fails, as it apparently does with some regularity, a hollow metal pipe is available on the apparatus which can extend the length of the wrench handle to increase the firefighter's leverage. To this technique can be added the use of the axe to tap the pipe or wrench.

On three of the hydrants encountered by Berkman on this single tour of inspection, she experienced difficulty in loosening the hydrant cap. On one occasion, another, more experienced firefighter stepped in and kicked the wrench resulting in freeing the cap. Berkman testified credibly that she herself had not employed this technique since she had been warned not to use it in the Training Academy because of the dangers of injury involved in kicking at an unknown source of resistance. On encountering difficulty on a second hydrant, Berkman accomplished the opening using an axe as prescribed in such circumstances. On a third resisting hydrant, after hitting the wrench with the axe, she went to get the pipe to expand her leverage, but before she could accomplish this, another firefighter succeeded in freeing the cap with resort to the pipe.

Subsequent to this incident Berkman was never faulted again for her performance in opening hydrants and, indeed, had no difficulty in accomplishing the evolution when tested on it again during her later re-evaluation at the Training Academy. Even assuming that this single incident demonstrated a lesser degree of strength than that possessed by the other firefighter who successfully opened the hydrant (which requires an inference that the other firefighter was in no sense the beneficiary of plaintiff Berkman's earlier work on the cap), it hardly establishes such incompetence in her performance as would justify her removal from the Department. To suggest, as her company commander's comment implicitly does, that female firefighters must be able to perform any task better than

any male firefighter is plainly discrimination on account of sex, since it takes no account whatsoever of acceptable differences in physical capacity between different firefighters, if one of the firefighters is a woman.

*Hose Operations.* The most serious criticism of plaintiff Berkman as well as of class member Gonzalez addressed their ability to operate a charged hose. The seriousness of this criticism stems not only from the fact that hose handling is obviously essential to firefighting operations, but also because loss of control of an operating hose is extremely dangerous to the officers and firefighters involved. A fully charged hose that slips from the grasp of the firefighter handling the nozzle can whip about under the pressure of the water with which it is charged, doing injury to nearby firefighters as well as becoming useless to fire extinguishing operations.

Hose handling is, however, a complex operation, involving not only strength to carry, advance, and control the line and nozzle, but also training, intelligence, and an ability to hear and follow instructions under the extraordinary conditions of heat, noise, and restricted visibility in which firefighting is performed. It is, moreover, a complex activity involving the coordinated efforts of the entire engine company working as a team consisting of a nozzle person, a backup, an officer directing the operations, other firefighters responsible for advancing the hose, and an operator at the engine or hydrant regulating water pressure.

Because of the complexity of the tasks involved in successful hose handling, it has been rejected whenever considered as a meaningful test of the individual physical capacities of persons seeking to qualify to be firefighters. Despite the very central nature of the task to successful firefighting operations, defendants themselves have consistently recognized that the vital role of experience, skill, and coordinated physical effort called upon by the task make it a highly unsuited operation to use on any short-term basis in order to determine if a firefighter has the physical capacity to do the job.

What has been said by no means establishes, however, that evaluation of a firefighter's ability to perform during hose handling operations can under no circumstances provide a basis for judging whether a firefighter is competent. It means merely that, when performance on these operations is used as the make-or-break factor on which to base a career determining decision, the observation of the firefighter must be prolonged and the analysis of the firefighter's performance detailed and careful. In the absence of such a prolonged and careful analysis and evaluation, not only may an individual firefighter be blamed for mistakes on the part of others in the coordinated operations, but also for ones that are either, on the one hand, entirely correctible by training or, on the other hand, unavoidable.

Only two instances of any difficulty in handling a hose are reported in plaintiff Berkman's evaluation reports prepared after the March 1983 meeting of company captains. The first appears in her six-month evaluation and reads in full as follows: "Fr. Berkman has intermittent trouble opening, closing and handling a 1¾" line. Recommend she be returned to Probie School for additional training for her protection and members' protection." While the authorship of this comment is disputed, I find, based on the evidence at trial, that the evaluation was made by Lieutenant Ralph Payson, who is listed as one of the two officers who evaluated Berkman during this period and who, in fact, appears to have observed Berkman's handling of the hose on most of the occasions during the period when she operated the nozzle of the hose. The principal reason for this finding is that Captain Mayerhoff, who himself claimed at trial to have authored the comment, noted on the evaluation form Payson's authorship of the evaluation and specifically disagreed with its suggestion that training would help in a comment that echoes a contemporaneous evaluation of Berkman by her ladder company supervi-

sor: "I do not believe it is a matter of training but that of strength." As a result of this comment by Berkman's captain, she was never returned to the Training Academy for any additional training in hose handling.

This comment by Berkman's superior officer in her evaluation forms stands in marked contrast with Berkman's actual performance as depicted not only in her own testimony, but also in a contemporaneous diary maintained by Lieutenant Payson, which appeared under highly questionable circumstances during the course of the trial.[13] What is clear from these sources is, first of all, that Berkman was assigned to operate the nozzle at almost every fire to which she was called during her probationary period. What is also clear is that she operated for the most part successfully throughout the period and that her failures were not those of strength, but rather resulted from a variety of different sources to be expected of any probationer learning his or her trade. As Lieutenant Payson noted in the first entry in his diary for November 28, 1982, after remarking on her difficulty in controlling the nozzle on her first time out, "[o]verall performance for Berkman not bad. [T]ypical proby first job." On her performance four days later on December 2, 1982, Payson noted: "Berkman takes nozzle to top floor, good operation. Had better control of the nozzle this time."

Although, as Berkman testified without contradiction, she thereafter acted as nozzle person on innumerable occasions, none of them drew comment favorable or unfavorable from Payson in his diary until May of the following year when he noted with approval her movement of a 2½ inch charged line on a fire on Essex Street on May 13.[14] The comment concludes with the note: "Handled nozzle well." The only other comment concerning Berkman's hose-handling ability that appears in Payson's diary (in which every negative observation concerning Berkman's performance testified to at trial is set forth) is an entry for July 26, 1983. This comment is instructive because it makes clear the complex considerations which can enter into an evaluation of hose-handling ability and the manner in which, with training, such ability can be improved.

"Box 291 1942 hrs. Rubbish in shaft at Pitt Street. Berkman has nozzle[.] [T]rips and falls in rear courtyard. Called for water and she let air out directly on fire. Lost control of nozzle—told her to shut it down—took a little longer than expected, as if she was doing what she wanted to do. Finally shut it down after repeated attempts to regain control. She later approached me and told me her backup was at least four feet behind her. I told her that was not the reason she lost control. The reason was that she had too much hose in front of her and when she opened she couldn't control it. She then said that the backup feed [sic] her too much hose. I told her she has to communicate w/ backup, i.e., too much hose, take some back; not enough[,] feed me. Maloney moves to

13. During the first day of his cross-examination, Lieutenant Payson testified in response to questioning by both the Court and plaintiff's counsel that he had destroyed handwritten notes he had determined to keep concerning Berkman for use in evaluating her. During the evening following the completion of his testimony, Payson produced to the City's attorneys a handwritten diary, the contents of which stands in marked contrast with his almost totally negative testimony concerning Berkman. While Payson explained that he had intentionally concealed the existence of this diary as a result of a misunderstanding of instructions given him by counsel for the defendants, that explanation only serves to highlight the lack of candor and fairness with which the officer appears to have thought appropriate, both in giving an account of his supervision of Berkman in his testimony and in supervising and evaluating her as a probationary firefighter. The contents of the diary make clear that Berkman performed much better as a firefighter than Payson was willing to give her credit for and serves to corroborate Berkman's own account of her work at the engine company.

14. Also noted with approval concerning this fire, but not mentioned in Payson's testimony was Berkman's alert discovery of a broken gas pipe, thereby avoiding a substantial risk of explosion.

better position, asks for nozzle. [H]as no problem handling it by himself."

What is apparent from this comment (which constitutes the most detailed written description of Berkman's hose-handling ability not only during her probationary period, but during her re-evaluation as well) is that her failures were not perceived even by her biased supervisor as constituting failures of strength, but rather as the result of a complex of factors including such entirely correctible factors as lack of training and experience and a failure to follow directions. What also comes through in this written comment as well as from the testimony of Payson and Mayerhoff are both Berkman's willingness to learn on the one hand and her supervisor's quite apparent niggardliness in volunteering the kind of detailed criticism and training which any probationary firefighter is entitled to in order to learn the trade.

The only other comment with regard to Berkman's hose-handling abilities recorded in her evaluation reports appears in her nine-month evaluation report and records the results of a test of her hose-handling abilities contrived by Captain Mayerhoff to determine at what level of pressure Berkman would no longer be able to handle a charged hose. As recorded in the evaluation form: "Fr. Berkman is unable to handle a 1¾" line with FT-2 nozzle at third pressure recommendation by T.B. Tool 7."

As described by the witnesses at trial, this laconic comment on Berkman's inability "to handle" a hose refers to a test administered by Captain Mayerhoff to Berkman in early May 1983. While the comment might well be read as referring to the dangerous situation in which a nozzle on a charged and operating hose slips out of the hands of the firefighter and imperils the safety of the team of firefighters operating on the hose as well as becoming useless in firefighting operations, in fact it does not refer to such a situation. What

the credible evidence at trial in fact establishes is that the failure was one on the part of the team of firefighters on the hose and not one on the part of Berkman alone and did not involve loss of control of the hose or nozzle imperiling the safety of anyone.

As described by Captain Mayerhoff, he determined, for reasons which are at best unclear, to formally test Berkman by having her operate as nozzle person at a drill at a graduated series of pressures on the charged hose. While she handled the nozzle without incident through each of the pressures set forth in the manual (including the maximum pressure described in the manual referred to as producing "an acceptable fire fighting stream" from the hose), an incident occurred when the water pressure was raised above that necessary to produce an acceptable stream, namely, the "third pressure" referred to in the evaluation form comment as "recommended" by a manual on the use of 1¾" hose.[15] That incident, so far from demonstrating a failure on the part of Berkman alone creating a dangerous situation for herself and others in fact reveals at worst a failure on the part of the team of hose handlers of which Berkman formed a part in which she continued to control the hose. According to the credible evidence at trial, Berkman advancing the hose on her knees as required for fire operations was pushed over by another probationary firefighter who was advancing the hose behind her from a standing position. So far from losing control of the hose in this situation, she instead "sat down," and then stood up again with the hose pursuant to Mayerhoff's direction and continued to advance the hose without further incident. No criticism of this performance was afforded either Berkman or the other probationer by the Captain who was standing by. The first adverse mention of the incident by the Captain was that quoted above in her evalua-

---

**15.** What is meant by "recommended" in this context is less than clear. The manual referred to simply sets forth the relationship between various water pressures and gallons per minute

of water flow. As noted in the text the manual explicitly states that the second pressure is recognized as producing "an acceptable firefighting stream."

tion report.[16] To characterize this incident as demonstrating an "inability" on Berkman's part to "handle" the charged hose is not only unfair to her as an individual, but constitutes, along with substantial other evidence, a strong showing of an effort to re-evaluate her underlying physical qualifications to be a firefighter in an intentionally discriminatory fashion.[17]

Given the biased evaluations and inadequate training afforded Berkman during the course of her eleven-month probationary period, the limited testing of her hose-handling ability during her re-evaluation at the Training Academy cannot stand. Even if that re-evaluation process had itself been entirely free of discriminatory animus (which it was not), it failed entirely to correct or take into account the biased withholding of training that occurred throughout her probationary period. Before dealing with the re-evaluation process of both Berkman and Gonzalez at the Training Academy, however, it is appropriate to consider the even more extreme mistreatment of firefighter Gonzalez at her engine company during her probationary period.

While plaintiff Berkman was being tested and re-tested to determine her physical capacity to be a firefighter at Engine Company 17, Ms. Gonzalez does not appear to have been afforded, except on a few occasions, even that opportunity to demonstrate her abilities. Instead, the credible evidence at trial establishes close to a year of sexual harassment, discriminatory treatment, and abuse, which is shocking not simply in the fact that it occurred, but that it was permitted to continue without remedy. Given the credible testimony at trial with respect to sexual harassment and discrimination to which she was subjected, what is surprising is not that Ms. Gonzalez was rated unsatisfactory on the few evolutions on which she received that rating on her re-evaluation at the Training Academy, but rather that she has had the courage to continue to pursue her goal of becoming a firefighter and learn as much as she plainly has about her chosen career.

Not only was Gonzalez subjected to the same litany of sexual harassment through comment, hazing, exclusion from the meals, and denial of the ordinary amenities

**16.** This lack of criticism and communication between both Berkman and Gonzalez and their respective supervisors is entirely characteristic of the quasi-adversarial posture which developed in their firehouses throughout the probationary period. With only isolated exceptions (such as that referred to above in the quotation from Payson's diary for May 1983), there appears to have been no more than the most perfunctory efforts to train and improve Berkman's and Gonzalez' performances in those instances in which the unsatisfactory performances were even called to the women's attention. This general unwillingness to help the women probationers improve constitutes not only telling evidence of intentional discrimination; it also goes a long way to explain the difficulties they encountered during their later re-evaluation at the Training Academy. To this lack of affirmative training and correction by the supervisors must be added the tolerated "silent treatment" the women received from the rank-and-file firefighters who refused to answer their questions about the job and, by putting them "out of the meal," deprived them of that opportunity used by all the other firefighters in the house to discuss and criticize each other's performance in the day's operations. This "silent treatment" by the men was observed by Berkman's supervisors and tolerated despite

what they testified at trial was their recognition that it stemmed from the men's reaction to Berkman's pursuit of her remedies in court.

**17.** In addition to these instances of failures in hose handling recorded in Berkman's evaluation reports, Captain Mayerhoff testified at trial to three other instances of difficulties with a hose. In one instance the Captain described Berkman graphically as being "bounced around the hall" by a $1\frac{3}{4}$" hose. In another he referred to an oscillating movement of the fire stream as a loss of control which she stopped by bracing the nozzle on a window frame. In a third instance he described her as refusing to open fully a booster line, the smallest hose carried, to put out a car fire. Each of these instances of unsatisfactory performance on the hose was vigorously denied by Berkman and is contradicted by her entirely satisfactory performance with the hoses involved not only at the Training Academy but on the occasions described by Payson in his diary. Further, it is quite incredible that the Captain would fail to record these failures against Berkman in his reports had they occurred in light of the more minor incidents of unsatisfactory performance he *did* include. Nor are the incidents reflected in Mayerhoff's diary concerning Berkman's progress as a probationer.

of cooperative firehouse living as Berkman, Gonzalez was physically abused in a sexual manner and, in response to her complaints, vilified and defamed for bringing them into the open. When, in response to this systematic mistreatment, she on one occasion lost control of her emotions, even that fact was recorded against her as evidence of her emotional instability for the job.[18] If any good can come of this sad history of mistreatment, it arises from Ms. Gonzalez' courageous refusal to back down and the assurance that such conduct, now brought to light, need never again be repeated in the history of the City's Fire Department.

Having heard the testimony at trial and observed the witnesses, I find by a clear preponderance of the credible evidence that Ms. Gonzalez was sexually abused by one of her supervisors during firefighting operations and in the firehouse, not once, but on a variety of occasions; that, when she complained of these instances of touching of her buttocks, breasts, waist, and hair to her captain, she was intimidated into withdrawing the complaints; and that no steps were taken to avoid repetition of these incidents except by Gonzalez herself by bringing them into the open. The highly charged emotions aroused by these proceedings, which surely should have merited action at the highest level of the Department,[19] were instead allowed to persist and to combine with other equally explosive incidents so as to infect her entire course of training and operations as a probationer.

Of at least equal significance with the incidents of direct physical harassment to which Gonzalez was subjected was what appears from the trial record to have been an entirely baseless accusation of physical cowardice. Again nothing appears to have been done by the captain of her firehouse about the incident, which, if true, was surely life threatening to her fellow firefighters, except to record it against her in her personnel records.[20] No investigation was

---

**18.** This record consists of a backdated and inaccurate memorandum purporting to have been written and signed by a Lieutenant DeSena to Gonzalez' captain reporting that "on several occasions I have witnessed Fr. 4th Grade Gonzalez crying in quarters while on duty ... She lacks the physical strenght [sic] to perform firefighting duties and in my opinion she is emotionally instable for the type of work this Department requires." When questioned, Lieutenant DeSena denied authorship of the document, testified that he had seen the woman cry only one time, that it was not his opinion that she was emotionally unstable, and that the signature on the document was not his.

**19.** The incident was brought to the attention of the Department at the highest levels by Gonzalez and her counsel. Although a memorandum of the incident was prepared by her captain and addressed to the Commissioner, the captain failed to forward it to its addressee.

**20.** Not only does the rumor of Gonzalez' cowardice appear to have been without foundation, the report of the incident, prepared by the captain of the engine company who did not observe the incident solely from reports from other firefighters and without discussing the matter with Gonzalez, is flatly contradicted by other company records. Thus, while Captain McGrail's report states that she "never got to the fire," the records of her use of air from her air tank support Gonzalez' testimony that, after leaving the hose at the express direction of supervising officers because a firefighter stepped on a floor board that was pinning her leg, she returned to assist in the hose handling until the entire company was relieved. The report further states that two firefighters in the company were placed on medical leave because of exhaustion brought about by Gonzalez' absence. The contemporaneous company log reveals that the firefighters involved left the fire, not as a result of exhaustion, but rather, in one case, because the firefighter stepped on a nail and, in the other, because of an injury to his hand. This patently inaccurate report about Ms. Gonzalez also casts light on another series of concededly backdated memoranda purporting to record instances of unsatisfactory performance by Gonzalez. What these reports and another in which McGrail taxes Gonzalez with emotional instability on the basis of numerous instances of crying reported to McGrail by a Lieutenant DeSena reflect is not wholesale fabrication of a record against Gonzalez, but rather a bias which deprives the reports of any reliability. While the defendants in their post-trial briefs suggest that Gonzalez can prevail on her application only by establishing that all the witnesses against her are lying, no such burden exists. Having demonstrated prima facie wholesale intentional discrimination against her pervading almost every aspect of her life as a probationer, the burden is on the defendants to establish that, despite such bias, Gonzalez was nevertheless unqualified for the job. In this connection, the backdating, inaccuracy, and partiality of the reports against

made into its merits, and no report of it was made until long after the event to those within the Departmental hierarchy in a position to take steps to avoid the dangers which it, if true, so clearly presented to her and her fellow firefighters.

Had an investigation of the incident occurred, it would have revealed, as did the evidence on the subject introduced at trial, that the accusation was totally without foundation. That fact alone might have begun to reveal the depth and force of the discriminatory animus to which Gonzalez was subjected. These two incidents and the manner in which they were handled alone call into question the fairness and accuracy of the evaluations of Gonzalez by her captain who, in contrast to the captain evaluating Berkman, did not even trouble to observe her performance at fires.[21] But beyond these incidents the startling discrepancies between those evaluations and Gonzalez' performance at the Training Academy during her re-evaluation make clear that Gonzalez was not fairly evaluated or trained during her probationary period.

As already noted, Commissioner Spinnato determined to re-evaluate both Berkman and Gonzalez despite the recommendations of their commanding officers that they be terminated at the end of their probationary period without further inquiry. One rea-

son for the decision, according to the Commissioner's testimony at trial, was his quite understandable concern that the recommendations of his subordinates might be unreliable because of discrimination in the workplace. This concern was reinforced by an earlier re-evaluation of a woman firefighter named Ella McNair which demonstrated that the evaluations of her supervisors were, in fact, inaccurate, resulting in a decision to grant tenure to McNair despite her supervisors' recommendation that she be terminated.

The re-evaluations of Berkman and Gonzalez should likewise have raised substantial questions about the reliability and fairness of the recommendations of termination made by their supervisors. The contrast in particular between the totally negative reports concerning Gonzalez and her success during the re-evaluation process should, in itself, have merited further inquiry as to how it came about that Gonzalez found herself in the position she did at the end of her probationary period.

In Berkman's case, despite the statement that she could not open hydrants or use a bolt cutter, she experienced no difficulty whatsoever in performing these tasks during the re-evaluations at the Academy. Despite unsatisfactory ratings by her supervisors on her operation of the power

---

her deprive both the paper record and the live testimony concerning her qualifications of much weight. As the Borough Commander of the Bronx, with direct supervision over the officers who evaluated Gonzalez, concluded in his comments on their recommendation of termination, it has not been established that, given a fair and objective evaluation, Gonzalez cannot do the job.

21. At trial defendants offered evidence from fellow firefighters from Gonzalez' engine company concerning a variety of incidents of unsatisfactory performance on the job which, because not called to the attention of her captain or the Commissioner, did not enter into their evaluations or her termination. From these incidents defendants argue that, even if Gonzalez' termination was infected by discriminatory animus, it was nevertheless proper because of her general incompetence to perform the tasks of firefighting. Cf. *Airlines Pilot Ass'n Int'l v. United Air Lines, Inc.*, 21 EPD ¶ 30,419 at 13,392 (E.D. N.Y.1979). Thus, one fellow firefighter testified

to an incident in which Gonzalez, misunderstanding the job of a "can man," responded to a request for a portable fire extinguisher by handing the "can" to the firefighter requesting its use. On another occasion Gonzalez is reported to have improperly released her grip on a charged hose to don her face mask, without realizing the effect of her actions on the other members of the hose-handling team. In a third incident Gonzalez was described as losing hold of her halligan while swinging it, sending the tool through a window into the street. While these detailed anecdotal accounts by Gonzalez' fellow firefighters of Gonzalez' maladroit performance as a probationer are considerably more credible than the more tendentious and generalized accounts of difficulties in handling the hose or raising the ladders at drills recorded against her by supervisors in backdated memoranda seeking to justify her termination, they hardly suffice to establish that Gonzalez is not capable of correcting her mistakes and learning the job, given fair and unbiased training and instruction.

saw, she performed that task satisfactorily as well. Gonzalez, who was reported by the officers of her engine company to have been incapable of using a halligan and axe or removing a suction cup from the pumper, and of tying a bowline on a bight in fact performed these tasks and others calling for similar strength and experience without difficulty during her re-evaluation. Other evolutions requiring strength and endurance, including carrying a folded length of 2½" hose to the fifth floor of a building in 30 seconds while wearing full fire gear, doing the same with a six foot hook and 2½ gallon extinguishers, climbing an aerial ladder to the same height, carrying a variety of equipment, sliding from a roof using a life saving rope, lowering a member to rescue another, operating a 1¾" line at the pressure required to produce a satisfactory fire stream, raising and extending a 25-foot portable ladder,[22] stretching, advancing, and operating a 2½" charged line to a top floor via a fire escape, ascending the outside of a building using a scaling ladder, stretching and operating a 2½" line to the fifth floor via the aerial ladder, relieving on a charged line in cellar under high heat and heavy smoke conditions, were all performed by both firefighters in satisfactory fashion at the Training Academy during their re-evaluation.

Both firefighters, however, earned unsatisfactory ratings in two areas, namely, their operation on a charged 2½" hose and their performance of the ladder company operations of pulling ceilings or wall bays with a six-foot hook.

Although they had at no time been criticized in the evaluations of their supervising officers during their probationary period for unsatisfactory performance of these ladder company tasks, both Berkman and Gonzalez were given a one-time test of their abilities in this regard during their re-evaluation at the Training Academy. At the conclusion of their efforts to open a ceiling and sidewall using a firefighter's hook, both were rated unsatisfactory because of the time they took to perform the evolutions when compared with the times recorded for several other firefighters who were also tested at the same time. While this method of making the decision whether to permit Berkman and Gonzalez to pursue a career as a firefighter may itself be criticized since it compared their performance with other firefighters with considerably more experience than they, the principal ground for rejecting these tests as a proper method of evaluating their performance as a firefighter was evidence that they had received almost no training in the exercise on which they were tested, as well as evidence that women in particular require, because of their cultural background, specialized training in this area to learn the techniques needed for successful performance of the tasks.

The comments on Berkman's performance of this task characterize her as "poking" at the ceiling with the six-foot hook and striking the wall with such little force that the hook bounced off instead of engaging in the plaster. As established by the testimony at trial of Dr. McCardle, an exercise physiologist, the ballistic movements necessary to pierce a ceiling with a firefighter's hook and thereafter rip out lathes and plaster so as to discover hidden fire are not movements which women have much opportunity to learn or use in the tasks which are traditionally open to them in our society. Such sudden, violent movements, illustrated by Dr. McCardle by the example of the karate chop accompanied by what was described as the Connor's grunt or shout, are all that are necessary in order to pierce the plaster with the point of the hook and, thereafter, by reverse, sudden, and violent movements, tear out the wall. Given both women's overall strength and

---

**22.** "Extreme difficulties" in raising, extending, and carrying a 25-foot ladder were also recorded against firefighter Gonzalez. However, upon correction of her error of technique in raising the ladder, by using a straight arm raise in place of a bent arm, Gonzalez successfully completed the evolution and earned a satisfactory rating. Berkman was also reported to have encountered "extreme difficulty" in handling ladders in her re-evaluation, a report which appears totally without basis in her evaluator's description of the evolution.

endurance as demonstrated in their performance of other tasks both during the qualifying exam, on the job, and at the Training Academy, there is no reason to suppose that adequate training which they were denied will not permit them to accomplish the tasks in satisfactory time so as to permit them to pursue their chosen career.

In apparent recognition of the unfairness of terminating firefighters who had spent the bulk of their probationary period in engine companies on the basis of their unsatisfactory performance of ladder company tasks,[23] the Commissioner testified at trial that the sole reason for the decision to terminate both firefighters was their unsatisfactory operation of a charged 2½″ hose.[24] Consideration of the testimony offered at trial with respect to Berkman's and Gonzalez' unsatisfactory performance on two evolutions involving the 2½″ hose operations requires a conclusion, however, that the decision to terminate them on this ground was incorrect and a result of the bias encountered by both firefighters during the evaluations as well as throughout their probationary period.

What bears noting, first of all, is the extraordinary conflict in testimony with regard to the manner in which Berkman and Gonzalez actually performed the hose evolutions for which they were terminated. Having heard the testimony of the examiners as well as of Berkman and Gonzalez,

observed the demeanor and manner of the witnesses, assessed the interest and biases of each witness, and weighed the inconsistencies between the various witnesses including those between the defendants' witnesses themselves, I conclude that the account of the performance given by Berkman and Gonzalez of what they did is the more credible and plausible account of what happened. The testimony of one of the examiners in particular that one of the probationers, Gonzalez, physically dropped the charged nozzle eight times after which each time it was immediately recovered and restored to her hands, stands in such contrast with that of the other participants, including the other examining officer, that it leads to a conclusion that not only the examining officer's testimony but also his evaluation was so infected by bias against the probationers as to render suspect the entire procedure by which the two firefighters were rated unsatisfactory on the hose operations.[25]

Quite apart from this lack of credibility in the testimony concerning the performance of the two firefighters in the hose operations, there is also the overriding difficulty already noted of using the complex, coordinated activity of hose handling on a one-time, short-term basis as a means of evaluating the ability of an individual member of the firefighting team to perform his

**23.** Although both Berkman and Gonzalez were detailed for 30 days to a ladder company and given "an accelerated course in the basics of truckwork," the concluding evaluations recognized their need for more experience to overcome their shortcomings in that area. Overhauling and use of the hook to pull ceilings and wall bays was, however, not noted as an area in which Berkman experienced difficulty while at the ladder company.

**24.** In fact, both firefighters handled the charged 2½″ hose satisfactorily on two of four evolutions with the hose during the re-evaluation.

**25.** Despite the startling conflicts in testimony concerning the 2½″ hose operations not all of the available eyewitnesses to the incidents were called by the parties. In such a situation, as finder of fact, I have given the greater weight to the testimony which the uncalled witnesses were in a position to contradict or explain and assessed that weight against the defendants,

since the uncalled witnesses are employees of the defendant City and might reasonably be expected to support the testimony of their superior officers if they could. In making this determination, I have taken into account the plaintiff's burden and that of firefighter Gonzalez to establish their claims of intentional retaliatory discrimination by a clear preponderance of the credible evidence. This, they have done. I have attributed similar significance to defendants' failure to call at trial the lieutenant in direct charge of Gonzalez' group within Engine Company 60, who, according to the uncontradicted testimony, had the greatest opportunities to observe her day-to-day work and, in fact, rated her performance in all respects satisfactorily in the one written evaluation he was permitted by his captain to make. *Felice v. LIRR,* 426 F.2d 192 (2d Cir.), *cert. denied,* 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970).

or her job. Had a fair detailed and analytical criticism of the performance of the firefighters in fact confirmed other fair, detailed, and analytical criticisms of the firefighters during their probationary period, a different decision might well be required. But in the situation presented by this case in which the criticism of Gonzalez during her probationary period by her supervisors was so infected by bias as to be wholly untrustworthy and in which the criticism of Berkman was of such generality as to remove any basis for comparison, the finding of an unsatisfactory rating during the re-evaluation period becomes virtually useless as a means of deciding whether the applicants can, in fact, perform their work or not.

From the credible testimony at trial, it appears that, at worst, the two probationary firefighters experienced difficulty during the re-evaluation in handling the 2½" hose as a result of lack of coordinated effort of the team of hose handlers, lack of communication between the firefighters and the officers directing the operations, unusual conditions including lack of a full backup team and problems with water pressure, and most particularly lack of experience and training in handling the 2½" hose in the circumstances presented. Given the undisputed fact that Gonzalez had been almost totally deprived of opportunities to work on the nozzle and that Berkman had been almost totally denied criticism of her performance on the hose during their probationary period, what is surprising is not that their performance was less than satisfactory, but that they did as well as they did under the handicaps under which they were operating.

In sum, while Commissioner Spinnato correctly perceived the possibility that the firefighters' evaluations during their probationary period might be infected with bias, he inexplicably failed to consider that that bias would extend to denying the probationers the experience and training to which they were entitled, sufficient to place them in a position to demonstrate their ability to do the job. Since Gonzalez was, throughout her probationary period, almost totally denied the experience of operating at the firefront of the hose and since Berkman was almost totally denied the benefit of criticism and teaching in hose operations throughout her probationary period, I conclude that the decision to terminate them on the basis of their failures during the re-evaluation at the Training Academy was nevertheless caused by such bias of the officers who had charge of the applicants' training and education throughout their probationary period and that that decision to terminate them on that basis cannot stand.

## RELIEF

■ Because the applicants were terminated in violation of this Court's orders and as a result of discriminatory retaliation against them for their pursuit of their rights in this lawsuit, they are entitled to reinstatement to the Department with backpay and all of the benefits, including seniority, vacation, and pension rights to which they would have been entitled had they not been terminated following their re-evaluation. I entertain no serious doubts concerning Berkman's ultimate ability to perform as a firefighter, and what uncertainties exist concerning Gonzalez exist entirely because of defendants' failure to develop any reliable record concerning her work. Cf. Ginsberg v. Berlington Industries, Inc., 500 F.Supp. 696 (S.D.N.Y. 1980). No credible evidence exists on this record of an "uncooperative employee attitude." Cf. Anderson v. Methodist Evangelical Hospital, 4 FEP Cases 34 (W.Ky. 1971), aff'd, 464 F.2d 723 (6th Cir.1972). On the contrary, both applicants have demonstrated a willingness to learn and serve of quite extraordinary dimensions, given the circumstances to which they were each subjected. Nor is there any reason to think that the hostility permitted to exist in the particular firehouses in which they served their initial probationary period has so infected their relationship with the Department as a whole that continued association is impossible. Cf. EEOC v. Kallir, Phillips Ross, Inc., 420 F.Supp. 919, 926

(S.D.N.Y.1976), *aff'd,* 559 F.2d 1203 (2d Cir.), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). The applicants' reinstatement will be to the grade of probationary firefighter, fourth grade, entitled to complete their training and preparation for tenure under the supervision of officers other than those at whose hands they have experienced the difficulties set forth in this opinion and according to a program of training and on-the-job experience to be agreed upon between the parties or established by this Court, if the parties cannot reach agreement on the place, term, and scope of such an additional probationary period.

■ In addition, in light of the extraordinary evidence of intentional discrimination revealed by the trial evidence, the applicants are also entitled to a decree prohibiting defendants, their officers, and employees from further sexual discrimination and harassment interfering with their training and work and requiring defendants to take active steps to assure that neither the particular acts of discrimination revealed by this trial record nor other acts of discrimination repeat themselves. To this end, plaintiff is directed to settle an order on three days notice consistent with this opinion.