Cynthia GILARDI, Plaintiff,

v.

Gary SCHROEDER d/b/a Gary Schroeder Trucking, Defendant.

No. 83 C 5672.

United States District Court, N.D. Illinois, E.D.

Sept. 19, 1986.

Ellen G. Robinson, Burke & Smith, Chicago, Ill., for plaintiff.

Dann Duff, Addison, Ill., for defendant.

## MEMORANDUM ORDER

PRENTICE H. MARSHALL, District Judge.

Plaintiff, Cynthia Gilardi, and her husband, Leonard, began working for defendant, Gary Schroeder, in January 1980 as a team of cross-country truck drivers. Their work took them from Chicago, where Schroeder's depot is situated, to the West Coast and back. Schroeder hired other couples as drivers.

Schroeder was a sexaholic. He once boasted to an employee that he had never seen a woman he wouldn't have intercourse

with. His pad of daily reminder notepads entitled "Things to Do Today" was "illustrated" with a sketch of a man and woman engaged in intercourse. He used these notepads to give instructions to his female employees. He spoke to his female employees about sexual intercourse, group sex, and sexual orgies; commented on their breasts; asked them if they were wearing brassieres; and patted them on the buttocks. One of his employees, Edward St. Clair, was the brother of Schroeder's wife, Carol. In May 1982, St. Clair gave an affidavit to the Equal Employment Opportunity Commission in which he stated, "I was constantly asked [by Schroeder] to participate in group sex with himself and his wife, my sister." [1]

While Cynthia Gilardi found Schroeder's behavior offensive, she remained on her job because it was well-paying; she worked with her husband; and because of the nature of their work, she was seldom in the office.

In July 1981, Cynthia and Leonard Gilardi separated. There is a whisper in the record that this was occasioned by a relationship which was developing between Cynthia and Edward St. Clair. But there is no credible testimony which supports that. What the evidence does show is that one day Leonard evicted Cynthia from the cab of their tractor and threw her personal effects out after her.[2] This occurred at the end of a truck trip in the parking lot at Schroeder's depot, and Schroeder observed it.

Cynthia and Leonard had literally lived in the cab of the tractor. She was now homeless. Schroeder, whose wife was in Arizona visiting a friend, invited Cynthia to stay at his house. She did so with St. Clair.

Schroeder told his wife about this arrangement and she was displeased with it. Nonetheless, Cynthia and St. Clair remained in Schroeder's home for two or

three weeks, during which time Schroeder went to Arizona and returned with his wife. At that point, Cynthia and St. Clair moved into a mobile home which was available to St. Clair. While St. Clair testified at the trial that on one occasion during his and Cynthia's stay with Schroeder he observed Cynthia and Schroeder embracing, Schroeder testified before the EEOC that he never touched Cynthia until the night in question, to which we will turn our attention momentarily.

At this point in her life, Cynthia was essentially unemployed because she no longer had a truck to drive or a partner to drive with. Schroeder offered her a job in the office working on trip kits, i.e., itinerary, expense vouchers, computation of commission for the drivers, etc. Once she moved into the office, Schroeder's sexual interest in her intensified. He repeatedly brought up the subjects of intercourse, group sex, and sexual orgies. He remarked about her breasts, inquired whether she was wearing a brassiere, patted her buttocks, and on one occasion put his hand between her thighs. She rebuffed him. She told him that she did not want to engage in that type of activity with her employer. When asked during the trial why she stayed on the job, her response was understandable and credible: She was alone, the job paid $300 a week (with an intimation of $500 a week)—she had little economic choice.

After Gary and Carol Schroeder returned from Arizona, they engaged Cynthia in some social activity, which involved Patti and Walter Gwara, who were also husband and wife drivers for Schroeder. At the instance of either Gary Schroeder or Patti Gwara, the five (and perhaps six)—Gary and Carol Schroeder, Cynthia Gilardi, Patti and Walter Gwara and perhaps Edward St. Clair—gathered in the Schroeder's living room and discussed group sex and articles

---

1. St. Clair equivocally recanted that affidavit when he testified at the trial of this action. We held the affidavit admissible as a statement inconsistent with his in-court testimony, which was given under oath subject to the penalty of perjury at a proceeding before the EEOC. Fed.

R.Evid. 801(d)(1)(A); *see United States v. Castro–Ayon,* 537 F.2d 1055 (9th Cir.1976).

2. Both Cynthia and Leonard testified at the trial. Neither explained their sudden split-up. The reference to St. Clair was really a hearsay speculation by another witness.

dealing with "kinky" sexual activity appearing in *Forum* magazine. And on one occasion, at Gary Schroeder's suggestion (indeed insistence, according to Cynthia), the group played strip poker in which everyone disrobed entirely, except Gary, who was left in his shorts.

There is evidence that concurrently with these activities, various of the persons at Schroeder's business were using drugs "recreationally." Cynthia testified that Gary used Quaaludes and cocaine; Gary testified that Cynthia used cocaine, marijuana and Quaaludes. Gary invoked the privilege against self-incrimination when asked about his own activities; another office worker testified that Cynthia had told her (the coworker) that Cynthia used Quaaludes. Cynthia testified that Gary Schroeder provided her with Quaaludes, which she took once or twice to help her sleep.

On Saturday, September 12, 1981, Gary and Carol Schroeder invited Cynthia Gilardi to accompany them to an open house and a party. She did. After the party, the three returned by automobile to the mobile home where Cynthia was living. They sat outside and talked. Cynthia was very talkative. Instead of separating, the three of them went to the Schroeder home where they visited briefly in the living room. Carol Schroeder went to bed leaving Cynthia and Gary Schroeder in the living room.

When he appeared before the EEOC, Gary Schroeder admitted that he gave Cynthia Gilardi three Quaaludes, which she ingested.[3] She passed out. While she was in a stupor, Gary Schroeder had sexual intercourse with her, performed cunnilingus on her, and, according to his testimony, she performed fellatio on him. During a brief period of consciousness, she became aware that he was performing cunnilingus on her. She tried to push him off. He took her upstairs to bed, placed her in bed with his wife, and he then got in bed with

the two of them. There is no evidence from which it could be inferred that Cynthia Gilardi consented to, encouraged or provoked Schroeder's conduct.

Carol Schroeder awakened early the following morning to discover her husband and Cynthia in bed with her. She screamed at her husband and pummeled him. The two of them got out of bed and went downstairs where Carol continued berating Gary. Cynthia remained unconscious until noon. She was oblivious to the encounter between Carol and Gary.

Cynthia regained consciousness around noon. Gary took her to her mobile home.[4] Her friend, Edward St. Clair, was on the road. He reached her by phone and she told him what had occurred. He called Gary Schroeder, who told St. Clair that he had drugged Cynthia, had intercourse and cunnilingus with her, and that he had planned it that way.

Carol Schroeder insisted that Gary fire Cynthia. The following day, September 14, Cynthia reported for work. She spoke to Carol by phone and Carol told her that she was fired. She talked to Gary and Gary suggested that she make herself inconspicuous. She had a confrontation with Carol in a trailer in the parking lot at Schroeder's depot, which was witnessed by Schroeder's niece, Nadine Schroeder Leske. Carol Schroeder accused Cynthia of having intercourse with Gary and getting naked in their bed. She told Cynthia to get out of their lives. Cynthia responded that all she had done was have intercourse with him and that she needed the job. Carol persisted in her insistence that Gary fire Cynthia. On Wednesday or Thursday of that week he did so. He told Cynthia that she shouldn't come to work and that she could apply for unemployment compensation.

Cynthia returned to the mobile home where she ingested approximately 12 Quaa-

---

**3.** Before this court Schroeder invoked his privilege against self-incrimination when asked whether and when he had provided Cynthia with Quaaludes.

**4.** Gary Schroeder testified that he returned to Cynthia's mobile home where he slept with her that night. She denied that. Gary Schroeder

was such a manipulative, selective and impeached witness that we do not believe that testimony. Indeed, despite earlier proceedings before the EEOC and in discovery in this case, he acknowledged that the first time he had ever testified to this alleged incident was in this trial.

ludes. She was found unconscious by Patti Gwara, who took her to the hospital. She received emergency treatment and survived.

For some months she lived with the Gwaras and Edward St. Clair in Aurora. She then returned to her parental home in a northern suburb of Chicago where St. Clair lived with her for the better part of a year. She and St. Clair then separated. For the past two years Ms. Gilardi has been living with another man away from her parental home.

She testified credibly to her despondency and rejection of sexual activities for a considerable period of time following the incident of September 13, 1981. She was able to return to work in July 1982 and she has progressed through four salary grades since then and appears to be well-adjusted in her work, in her life and in her relationship with others at this time.

St. Clair disputed Ms. Gilardi's testimony with respect to her rejection of sexual activities. He testified that she remained sexually active throughout the entire period that he was living with her both in Aurora with the Gwaras and in Cynthia's parental home. St. Clair is of dubious credibility. We have previously referred to his affidavit before the EEOC in which he explicitly charged Gary Schroeder with sexual misconduct. He testified before the EEOC that Schroeder admitted that he had "planned" his drugging of and sexual activity with Ms. Gilardi. Yet he testified on behalf of Schroeder at the trial. He is a forsaken lover who is very embittered by the experience. We give little credit to his testimony.

In January 1982, Ms. Gilardi went to the Equal Employment Opportunity Commission and complained of sexual harassment by Gary Schroeder. She filed a timely charge with the Commission on March 1, 1982. The EEOC conducted an extensive testimonial investigation of the case. On May 10, 1983, it issued Ms. Gilardi her right to sue letter. Her pro se action was timely filed here. We appointed Ellen Robinson, Esq. to represent her. Ms. Robinson filed an amended complaint on behalf of

Ms. Gilardi alleging, in count 1, that she was terminated from her employment unlawfully because of Gary Schroeder's sexual harassment and activity in violation of Title VII of the Civil Rights Act of 1964, in count 2, that Gary Schroeder had committed a battery upon her by his performance of non-consensual intercourse and cunnilingus on her on September 13, 1981 and in count 3 that Schroeder by his same behavior intentionally inflicted emotional distress upon her.

The case was tried without a jury. This memorandum constitutes our findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

■ We conclude on the facts as we have recited them that plaintiff is entitled to recover under Title VII. There are no available precedents. But this past term, the Supreme Court, in a sexual harassment case, held that the guidelines of the Equal Employment Opportunity Commission, including the expansive definition of sexual harassment, are entitled to great deference by the courts in these difficult cases. *Meritor Savings Bank, FSB, v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). There the Court specifically approved and relied upon 29 C.F.R. § 1604.11(a) which provides, inter alia, "unwelcome sexual advances ... and ... physical conduct of a sexual nature constitutes sexual harassment when ... (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual...." *Id.* 106 S.Ct. at 2405.

Gary Schroeder's sexual activity with Cynthia Gilardi was the sole cause of Cynthia Gilardi being terminated as an employee of Gary Schroeder. Schroeder's wife's insistence that Cynthia be terminated is understandable. But that insistence was provoked by Gary's sexual activity with Cynthia and his placing her in bed with himself and his wife. Cynthia is entitled to recover under Title VII, which makes it "an unlawful employment practice for an employer— ... to discharge any individual

... because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a) (1982).

Cynthia Gilardi is also entitled to recover under count 2 of her amended complaint. The evidence persuades us beyond a reasonable doubt that Gary Schroeder intentionally drugged Cynthia Gilardi and then while she was unconscious had sexual intercourse with and performed cunnilingus upon her. Under the Illinois law which controls this pendent claim, Gary Schroeder raped Cynthia Gilardi. Ill.Rev.Stat. ch. 38 § 11–1(a)(1) (1983) *repealed and replaced by* Ill.Rev.Stat. ch. 38, §§ 12–12 et seq. (1985). His behavior constitutes a civil battery.

Finally, plaintiff is entitled to recover for Schroeder's intentional infliction of emotional distress. In *Knierim v. Izzo,* 22 Ill.2d 73, 86, 174 N.E.2d 157, 164 (1961), the Supreme Court of Illinois described the elements for the claim of intentional infliction of emotional distress.

> [W]hether words or conduct are actionable in character is to be made on an objective rather than subjective standard, from common acceptation. The unwarranted intrusion must be calculated to cause 'severe emotional distress' to a person of ordinary sensibilities, in the absence of special knowledge or notice.

The conduct must exceed the bounds of decency. *Harris v. First Fed. Savings & Loan Association,* 129 Ill.App.3d 978, 85 Ill.Dec. 89, 473 N.E.2d 457 (1984). Certainly Schroeder's conduct—his drugging of Ms. Gilardi, his premeditated sexual attack upon her, and his putting her in bed with his wife—exceeded the bounds of decency.

What remains is the remedy. Ms. Gilardi is now well employed and does not wish to return to Gary Schroeder Trucking. But she does claim back pay under Title VII and she is entitled to recover it. Computing her projected salary with Schroeder at $300 a week, making no allowance for the projected increase which was intimated, and giving Schroeder the mitigating effect of unemployment benefits which she received, the difference between the income which Ms. Gilardi would have received with Schroeder and that which she did receive (plus unemployment compensation) through March 15, 1985 amounts to $12,960.50 to which she is entitled. Ms. Gilardi is not entitled to any other form of compensatory damages under her Title VII claim stated in Count 1. *Bohen v. City of East, Chicago, Indiana,* 799 F.2d 1180 (7th Cir.1986).

Under counts 2 and 3, she is entitled to damages for invasion of her body, injury to her psyche and injury to her self-esteem and dignity, all of which should properly be taken into account in assessing compensation for a young woman such as Ms. Gilardi who has been violated in the manner she was. Recent decisions in this district and in the Court of Appeals for this circuit dealing with strip searches provide some guidance in this regard. An award of $50,000 as compensatory damages under counts 2 and 3 is appropriate. In respect to count 2, Ms. Gilardi's loss of her job was proximately caused by Schroeder's misconduct. Accordingly, she is entitled to lost wages of $12,960.50 as damages incurred under count 2. This is not intended to be an award cumulative to count 1 but in the event count 1 should not be sustained, back pay damages are also awarded under count 2.

Finally, Ms. Gilardi is entitled to punitive damages under counts 2 and 3. Schroeder's behavior was reprehensible; indeed, it was criminal. In these circumstances $50,000 in punitive damages is reasonable.

Finally, under count 1, plaintiff is entitled to an award of attorney's fees. We invite an application by Ms. Robinson whose services in this case have been outstanding.

Accordingly, judgment will enter in favor of the plaintiff, Cynthia Gilardi, and against the defendant, Gary Schroeder, in the amount of $112,960.50 together with her costs and attorney's fees to be determined upon a timely application filed within 10 days of the entry hereof.