Maria J. CARRERO, Plaintiff,

v.

NEW YORK CITY HOUSING AUTHORITY, Miguel Peterson, Robert Harold, Al Parker and Rosalind Reyes Linares, Defendants.

86 Civ. 1061 (RWS).

United States District Court,
S.D. New York.

Aug. 7, 1987.

Arthur J. Levy and Michael H. Sussman, Brooklyn, N.Y., for plaintiff.

Manuel H. Quintana, Gen. Counsel, New York City, for defendant New York City Housing Authority; A. Joaquin Yordan, of counsel.

## OPINION

SWEET, District Judge.

The plaintiff Maria J. Carrero ("Carrero") initiated this action against defendants the New York City Housing Authority ("NYCHA") and the defendants Miguel Peterson ("Peterson"), Robert Harold ("Harold"), Al S. Parker ("Parker") and Rosalind Reyes Linares ("Linares"), certain officers and employees of NYCHA seeking relief under Title VII, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981. In accordance with the findings of fact and conclusions of law which follow, judgment will be entered in favor of Carrero and against Peterson and the NYCHA, and the complaint against the remaining defendants will be dismissed.

### Prior Proceedings

On November 4, 1985, plaintiff filed a complaint against defendants under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.*, with the United States Equal Employment Opportunity Commission. On March 27, 1986 the Civil Rights Division of the United States Department of Justice issued a Notice of Right to Sue Letter to Plaintiff.

Carrero filed this action on February 5, 1986 and sought a preliminary injunction for reinstatement as an Assistant Supervisor at NYCHA's project in the Bronx, the Morrisania Air Rights Project ("MAR") anticipating her demotion from that position which was formalized on February 10, 1986, following a probationary period. The motion for preliminary relief was withdrawn, and Carrero obtained leave from NYCHA pending the resolution of this action.

Discovery was completed, and the action was tried to the court on February 4–11, 1987. Proposed findings, conclusions and post trial briefs were submitted, and by agreement of the parties final argument was held on May 29, 1987.

### The Issue

Carrero's claim under the facts found below requires the court to define the boundaries of a "hostile environment," *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), in the work place arising out of sexual harassment. This would be a delicate and difficult task at any time, but it is particularly so in today's climate. In this most sensitive arena of sexual politics the concepts of equality and the protection of rights are in the midst of constant philosophical and legal evolution.

### The Facts

Carrero is a thirty-three year old single Puerto Rican woman, a high school graduate who has been an employee of NYCHA since September, 1981. By study and promotion, she progressed from a Heating

Plant Technician to a provisional Assistant Resident Building Superintendent ("Assistant Superintendent"). She is literal, determined and a hard worker, clear about her objectives, serious about herself and her perception of the world about her. Members of her family are also NYCHA employees, and Carrero sought to perform activities which had previously been performed almost exclusively by males, only ½% of the work force in her job category being female.

While serving as a Heating Plant Technician at Edenwald Houses, also a NYCHA project which she was assigned in 1982, Carrero was subjected to experiences she found distasteful, in particular, an incident in which a male co-worker dropped his trousers in her presence. She obtained counsel, complained to NYCHA which offered her a transfer and leave. The offending employee was censured.

Thereafter, on June 12, 1985, having passed a promotional examination for the post, Carrero was transferred to MAR as an Assistant Superintendent to commence a one year probationary period. Barney Woods ("Woods") was the Resident Building Superintendent ("Superintendent") in charge of all maintenance operations including providing heat, hot water, electricity, general cleaning and maintenance. This work is supervised by the Superintendent and Assistant Superintendent and performed by some 38 boiler room technicians, caretakers, groundsmen and part time workers. Woods began to train Carrero in her duties. Woods was replaced by Peterson as acting Superintendent on August 12, 1985. Harold was the Chief Superintendent for the Bronx South District of NYCHA; Parker was the Manager of MAR, and Linares was the Director of Equal Opportunity for NYCHA.

Peterson is an unmarried Puerto Rican male, who advanced to the rank of Supervisor after 15 years of employment with NYCHA. He previously served at MAR as an Assistant Supervisor and was well regarded by management. Peterson had generally good relations with the staff despite his reputation as a hard charger and a disciplinarian whose fuse was shorter than the average. Peterson is an affirmative, hands on supervisor who is proud of his position, and whose perception of his own masculinity is a factor in his relations with female employees.

At the outset of the relationship between them, Carrero and Peterson cooperated with one another, and the interpersonal atmosphere was entirely satisfactory. Carrero was Peterson's principal assistant and accepted training as to procedures and practices. Peterson, as a fellow Hispanic, expressed his pride in her success and stated his intention to train her to be an outstanding Superintendent. Peterson had a first-name, flirtatious relationship with a number of women in the office at MAR which was accepted in relatively good humor by all concerned, including, at the outset, Carrero. Several of the female workers at NYCHA testified that they observed Carrero engage in conduct which could be construed as flirtatious.

Each morning, the course of their duties required Peterson and Carrero to confer. Starting in early September, Carrero noted a course of conduct by Peterson, including a hand on the knee on September 4, touching on the arm, the shoulder, and culminating in a kiss on the neck on September 10. During this period Peterson addressed Carrero in terms she felt were inappropriate ("jerk," "scatterbrain," "dingbat").

The day after the kiss on the neck, Carrero went to Helen Clark, the paint inspector, a female co-worker, recounted the latest incident, and received the advice that she (Carrero) should tell Peterson to stop his conduct. On September 12, Peterson complained to Carrero about her conversation with Clark, telling her, "what goes on in this office, stays in this office." Carrero told Peterson she wanted him to stop his conduct and showed Peterson a notice of a conference which related to her then pending charge of harassment at Edenwald. He indicated familiarity with the issue. Later that day he referred to Carrero as "scarecrow."

On the morning of September 17, after a discussion of Roll Call procedures, Peter-

son kissed Carrero on the neck. She protested, and he undertook never to repeat the conduct and left. He later returned, asked her if he could treat a pimple on her nose and requested that she remove her glasses so that he could see her eyes. She refused. He sought to kiss her. She refused. Later that day Peterson stated that he would fail her on her probation report.

The following day, September 18, Peterson suggested that they meet outside the office and again sought to kiss her. She hit him with a ruler, and knocked his glasses off. He laughed. She stated she would report him. He directed her to "shut up" and conduct the Roll Call. She did and was criticized publicly by Peterson.

The following day another Roll Call incident took place, in which Peterson indicated he would continue to be critical of her, and Carrero cried in Clark's presence.

Carrero contacted her attorney who on September 23 wrote to the NYCHA on her behalf stating the improprieties of Peterson's conduct affirmed by the oath of Carrero. Carrero that day also circulated the following petition which was signed by fellow employees:

Sept 23, 1985

My name is Maria Carrero and I work for the N.Y.C.H.A. as an Assistant Superintendent at Morrisania Air Right 3073 Park Ave.

On Wednesday morning at about 8:10 AM while I was doing role call in the lunch room and giving my workers their job assignments, Supt. Mr. Peterson walked into the lunch room and started shouting at me saying that I did not know my job, I did not know what I was doing and I should not be here. I was humiliated in front of my workers with no respect at all on Sept. the 18th 1985. I am very hurt by this. Thank you.

Maria Carrero Asst. Supt.
R. White Lurat
L. DuBois
G. Pearson
Antonio M. Torres
[unintelligible]
Morris Green
Juan Flores
Leroy Turkes
Maisis Serrano
[unintelligible]
S. Chisow
Luis Barieto

At some time she had obtained a tape recorder and placed it in her desk. Quite obviously, the environment became mutually hostile from the receipt of the letter from Carrero's counsel, whatever it had been before.

On September 30 NYCHA had initiated an investigation into Carrero's charges which was conducted by Linares. Linares' notes of the investigation were preserved and admitted into evidence by the parties and provided useful evidence. While not trained as an agent of the Federal Bureau of Investigation, Linares interviewed all those with knowledge of the facts and preserved the knowledge thus acquired. Linares conducted the investigation under the supervision of the legal department. While details of the investigation might well have been performed in a different fashion or sequence, it was a competent, good faith performance, completed on November 15, 1985, appropriate to the task at hand. The report was submitted to the Chairman of the Authority. No further formal action of any kind was undertaken. The report stated Carrero's charges were unsubstantiated, noting the conflict in the statements and the absence of the tapes which Carrero had initially stated would establish her charges.

On October 17, before Linares had completed her investigation, Peterson filed a Supervisory Probationary Report, a standard NYCHA form, with an overall satisfactory performance evaluation of Carrero. Some of the comments included "lack of formal training," "inability to distinguish between emergencies and non-emergencies," "conflicting or contradictory assignments," "forgetful in that directives and instructions need to be repeated to her several times," "shows interest in job and cooperates in getting job done," "very prompt," and concluding with "with further experience and training, especially in

supervisory skills, skillo [sic], she could be fully capable of carrying out the responsibilities of Ass't. Superintendent."

At a meeting on October 31, Carrero's probationary period was extended, and Peterson gave her a favorable recommendation.

By January 24, 1986—after Linares' investigation had been completed, and no further action was contemplated—Peterson stated different conclusions in his report of that date. It was preceded by a memo of January 21 containing "a list of Actions or Inactions on your part which have led me to give you this memorandum." This memo recounted certain incidents from November 27, 1985 through January 7, including failure to hand in work tickets, improper procedure while calling in sick, absent without leave, failure to complete a move-out, failure of the hot water system, improper logging of fuel oil delivery, yelling when criticized, "then later you called the Police on me accusing me of harassing you."

Carrero entered her defense by memo of January 29, in effect either denying the charges or placing the blame on Peterson for having given her improper or inadequate instructions.

On January 24, 1986 Peterson gave Carrero an unsatisfactory rating in his Supervisory Probation Report which included the following comments: "poor leadership, indecisiveness, lack of ability to grasp what is taught or explained over & over," "poor judgment," "continual absententism." The report was approved by Parker. Carrero's reassignment to Heating Plant Technician followed on February 6.

This result had been anticipated by the filing of this action on January 3, 1986.

A considerable amount of conflicting evidence was adduced concerning Carrero's conduct after the time of the first satisfactory rating, and before the unsatisfactory rating of January 24. The actions at issue included a purchase of a radiator, procedures with respect to work tickets, attendance at staff meetings, required attendance at a union meeting, performance of roll call, operation of the storeroom, execution of move-out forms, calculation and maintenance of fuel oil consumption records, enrollment in training programs and the acquisition of training materials, check cashing procedures, the Training Center incident, reporting with respect to burglaries, maintenance of fuel oil log book. A number of memoranda and counter memoranda were prepared contemporaneously by various participants in the events. Whether the shortcomings charged to Carrero were properly attributable to her bad judgment, negligence, or incapacity or to Peterson's bad faith need not be resolved for reasons set forth below.

Carrero did not receive from Peterson the quality and type of legitimate training that she had been receiving before her rejection of his advances and her good faith invocation of appropriate measures for legal redress. It is a fair inference that her conduct was being minutely observed subsequent to the time that Linares completed her report, and Peterson, as a result, no longer felt that he had a sword hanging over his head.

In January, 1986, Carrero obtained a prescription for Valium.

NYCHA has a stated policy against sexual discrimination which is contained in the OEO Informational Overview which was distributed to all supervisory staff in field and central office locations on September 21, 1979. On July 22, 1981 the chairman of NYCHA called attention to past bulletins on the subject and enunciated the NYCHA policy that "Sexual harassment—is clearly prohibited—and will not be tolerated." A further bulletin was issued by the General Manager of NYCHA on October 2, 1981.

## Conclusions of Law

Jurisdiction over this action is established by Title VII of the Civil Rights Act of 1964, as amended, specifically 42 U.S.C. § 2000e-5, and § 2000e-5(g), and 42 U.S.C. §§ 1981 et seq. and 28 U.S.C. §§ 1331, 1341, as well as 42 U.S.C. § 1983, the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and the laws of the United States, and in connection there-

with, 28 U.S.C. § 1331(a) and § 1343, subsections (3) and (4).

These facts must be filled into the precepts of *Meritor*, where the female plaintiff testified to four years of sexual harassment by her superior including 40 to 50 instances of intercourse. The Court stated:

> In defining "sexual harassment," the guidelines first describe the kinds of workplace conduct that may be actionable under Title VII. These include *"[u]nwelcome sexual advances, requests for sexual favors,* and other verbal or physical conduct of a sexual nature." ... Relevant to the charges at issue in this case, the guidelines provide that such sexual misconduct constitutes prohibited "sexual harassment," whether or not it is directly linked to the grant or denial of an economic *quid pro quo,* where "such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

*Meritor,* 106 S.Ct. at 2405 (emphasis added).

Noting that lower courts have uniformly so held, the *Meritor* Court approved of the construction of Title VII put forth in the guidelines, and held "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created *a hostile or abusive work environment."* *Id.* 106 S.Ct. at 2405-06. The Court went on to quote an Eleventh Circuit case:

> Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. *Surely, a requirement that a man or woman run a gauntlet of sexual abuse* in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.

*Id.* 106 S.Ct. at 2406 (quoting *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir.1982)) (emphasis added).

Not every offensive act is actionable under Title VII in a hostile environment suit:

> For sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." Respondent's allegations in this case—which include not only pervasive harassment but also criminal conduct of the most serious nature— are plainly sufficient to state a claim for "hostile environment" sexual harassment.

*Id.* 106 S.Ct. at 2406 (citation omitted).

Finally, as the *Meritor* Court explained, the crucial inquiry for a district court is whether the sexual advances were "welcome":

> [T]he fact that sex-related conduct was "voluntary," in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII. The gravamen of any sexual harassment claim is that the alleged sexual advances were "unwelcome." While the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact, the District Court in this case erroneously focused on the "voluntariness" of respondent's participation in the claimed sexual episodes. *The correct inquiry is whether respondent by her conduct indicated that the alleged sexual advances were unwelcome,* not whether her actual participation in sexual intercourse was voluntary.

*Id.* (emphasis added).

Under these precepts, Peterson's conduct was sexual in character, unwelcome and harassing. What's more, in the special relationship between a superintendent and a probationary assistant superintendent, repeated unwelcome sexual advances assume a special significance. Peterson and Carrero were required to work closely together, meet together every morning, and he was responsible for insuring that she was trained in every facet of the job. Carrero is not required to be constantly on guard against having her supervisor fondle her knee, kiss her on the

neck, or seek to kiss her on the lips. In a job which requires such interpersonal interaction and training, for a limited period Carrero was required to "run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living." *Meritor*, 106 S.Ct. at 2406.

The conclusion that Peterson created a "hostile environment" leads to the consideration of NYCHA's liability under the facts as here. EEOC guidelines provide, "an employer ... is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence." 29 C.F.R. § 1604.11(c). Such a construction of the authorizing legislation would place a greater burden on employers than do general agency principles. Although the administrative interpretation of the statute which the agency is charged with enforcing is normally "entitled to great deference," *Griggs v. Duke Power Co.*, 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971), the *Meritor* Court held that it was error to disregard general principles of agency, that Title VII does not—as the regulation suggests—impose "absolute liability on employers for the acts of their supervisors, regardless of the circumstances of a particular case." *Meritor*, 106 S.Ct. at 2409. The Court explicitly directed attention to the Restatement (Second) of Agency §§ 219–237 (1958), which addresses the question of when a master is charged with liability for the torts of a servant.

In *Meritor*, the EEOC urged a rule of law—based on their interpretation of general agency principles—which was at odds with their own regulation. They argued that agency principles lead to "a rule that asks whether a victim of sexual harassment had reasonably available an avenue of complaint regarding such harassment, and, if available and utilized, whether that procedure was reasonably responsive to the employee's complaint." *Meritor*, 106 S.Ct. at 2408 (quoting EEOC *Amici Curiae* brief).

Aside from directing that courts apply general principles of agency in passing on employer liability, the *Meritor* Court declined to elaborate further, and thus reserved the question of whether the EEOC had correctly stated agency principles in its *amicus* brief.

The rule set out in the Second Restatement of AGency is: "A master is subject to liability for the torts of his servants committed while acting in the scope of their employment. Restatement (Second) of Agency § 219(1) (1958). If, however, the servant was acting outside the scope of his authority, the master is not liable except under delineated circumstances, one of which is that "the master was negligent or reckless." *Id.* at § 219(2)(b).

It is a close question as to whether this kind of intentional tort is inside or outside the scope of Peterson's employment. An act may be found to be within the scope of employment even if the master has explicitly forbidden it, *id.* at § 230, or even if consciously criminal or tortious, *id.* at § 231. As illustrations to the Restatement show, the intent of the agent (whether he believes he is serving the principal or serving himself) weighs heavily. For instance, if a janitor puts broken glass on a wall to keep out boys who climb the wall to intrude, the act will be within the scope of his employment if part of his job is to prevent intrusions. *Id.* at § 229, illustration 6. However if the janitor does the same act and "has in mind chiefly the punishment of a particular boy whom he dislikes," then the act is not within the scope of his employment. *Id.*, illustration 7.

■ Here, to train, discipline, and criticize a probationer is clearly within the scope of Peterson's employment. However, if he punishes and criticizes Carrero for illegitimate motive, then he is acting for his own reasons, and thus outside the scope of his employment, particularly when, as here, such conduct has been expressly and repeatedly forbidden by the master.

■ As already noted, the principal may be liable for the agent's acts, even if they are outside the scope of his employment, if

the principal was negligent or reckless. *Id.* at § 219(2)(b). One way that NYCHA could have been negligent would have been negligently to have investigated her charges, but, as found above, the investigation was not negligent.

■ Here NYCHA had notice of the incidents giving rise to the action and investigated in good faith, and no further sexual harassment, as such, occurred. While Carrero sought to infer actual knowledge by the NYCHA of Peterson's sexually harassing conduct, she has not succeeded, and NYCHA is consequently not liable for Peterson's acts of harassment and the creation of a hostile sexual environment.

The question of Carrero's unsatisfactory rating by Peterson on January 24, 1986 and Carrero's subsequent failure on probation implicate somewhat different concerns. The elements of the rating were subjective, facially justified, and devoid of any open sexual content. It is entirely possible that Carrero does not possess the qualities which are necessary for the performance of the duties of an Assistant Superintendent. However, the evidence adduced at trial established that the relationship between Peterson and Carrero soured after Carrero sought to stop his sexual advances through appropriate channels. Her actions were more closely scrutinized, and she did not receive the dedicated training and support to which she was entitled and which she had previously received from Superintendent Woods and even Peterson himself at the beginning of his supervision of her.

■ Whether or not Carrero was qualified at the time she failed her probationary period is not the issue for this court. The question is whether she received a fair opportunity to pass, which demands that she receive the training to which she was entitled, as well as a fair evaluation of her performance after her training was complete. The evidence shows that she received neither of these.

The Honorable Charles P. Sifton faced a similar situation in *Berkman v. New York,* 580 F.Supp. 226 (E.D.N.Y.1983), *aff'd,* 755 F.2d 913 (2nd Cir.1985). The case involved two female firefighters whom the Fire De-partment had failed during their probationary period. The facts showed that the hostility of the male firefighters and immediate supervisors with whom they were serving their probationary terms deprived them of the constant formal *and* informal training, correction and support that a male probationer would receive. As here, much of the evaluation of the probationers was picayune and conducted by hostile observers. As the Court noted in *Berkman,* even assuming that a probationer was, in the end, measured by unbiased criteria, any such test would "fail[ ] entirely to correct or take into account the biased withholding of training that occurred throughout her probationary period." 580 F.Supp. at 239.

The remedy for this is not to grant the plaintiff a job for which she may not be qualified. Instead, the *Berkman* Court reinstated the plaintiffs as probationers, and directed that they be afforded necessary opportunities to train and prove themselves fairly:

> Since the women were never given an opportunity to train and overcome the deficiencies revealed in their re-evaluations and since it is clear that opportunity was deliberately withheld from them by company officers intentionally pursuing an effort to prove that the women lacked their basic capacity to be firefighters, reinstatement with an opportunity for additional training in the area of their perceived deficiencies is necessary in order to permit them to demonstrate that they can perform competently in their intended careers.

*Id.* at 233.

Carrero has not sought here to establish that she has a property right in her job sufficient to trigger due process protection and has not litigated the related issue of what process is due. That notwithstanding, the right to an impartial decisionmaker is one of the most elemental due process rights, *see Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970), and under the facts here, Peterson is personally far too interested in Carrero's professional progress (more precisely, in the lack thereof) to qualify as impartial.

While not decided on this ground because it has not been raised and briefed (for instance the statutory and regulatory entitlements of a probationer have not been fully laid out), the fact that Carrero did not receive an impartial decision leads to an inference that a hostile environment, sexual harassment and retribution triggered by her good faith recourse to the legal system prevented her from receiving the legitimate training and evaluation to which she was entitled.

**Remedies**

Carrero has established no damage in the nature of pain and suffering. There is no competent evidence that any anxiety, or nervousness has resulted from the events accounted above. Carrero did not in her pretrial order demand punitive damages as against Peterson, and none will be awarded. As noted, NYCHA will not be liable for Peterson's conduct under the hostile environment cause of action.

■ As a Heating Plant Technician who has passed the agency's qualifying test, she is entitled to a new probationary period as an assistant Superintendent administered by a suitably impartial supervisor, certainly one other than Peterson. NYCHA will take necessary steps to insure that Carrero does not become a third time victim of sexual harassment at the hands of its employees, and to see that she receives appropriate training and evaluation. No punitive damages will be awarded against NYCHA.

Costs and reasonable attorneys' fees will be taxed.

A judgment will be entered granting relief in accordance with these findings and conclusions. Carrero is hereby granted leave to reopen this action within one year of the entry of judgment to enforce the relief hereby granted without any additional filing fee and upon motion setting forth good cause. Plaintiff will submit an order on ten (10) days notice.

IT IS SO ORDERED.