724 F.Supp. 99 (1989)
Linda G. WATTS, Plaintiff,
v.
NEW YORK CITY POLICE DEPARTMENT, Defendant.
No. 88 Civ. 7715 (RWS).
United States District Court, S.D. New York.
September 26, 1989.
*100 *101 Chadbourne & Parke, New York City, for plaintiff; by Bernard W. McCarthy, Susan Jameson, Ann K. Bernhardt, of counsel.
Peter L. Zimroth, Corp. Counsel, New York City, for defendant; by Norma A. Cote, Howard Singer, of counsel.
SWEET, District Judge.
Pursuant to Rule 12(c), Fed.R.Civ.P., defendant New York City Police Department ("NYPD") moves for judgment on the pleadings to dismiss a Title VII sexual harassment complaint brought against it by a former female employee, Linda G. Watts ("Watts"). For the reasons set forth below, the motion is denied.

Prior Proceedings
Watts was employed by the NYPD as a probationary officer beginning on July 16, 1984. For reasons discussed below, Watts resigned from her position on August 20, 1984, while undergoing Police Academy training. Shortly following her resignation on September 18, 1984, Watts filed sexual harassment charges against the NYPD with the New York District Office of the Equal Employment Opportunity Commission ("EEOC"). Those charges were also filed with the New York State Division of Human Rights. Nearly four years later, in August 1988, Watts received from the EEOC a Notice of Right to Sue.
In October 1988, plaintiff, proceeding pro se, commenced this federal court action alleging she was sexually harassed by the NYPD in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"). Following Watts' retention of counsel, an amended complaint was filed on December 21, 1988. NYPD submitted its answer and affirmative defenses on January 17, 1989, and moved for dismissal on March 31, 1989. The motion was heard and considered fully submitted on June 9, 1989.

The Facts as Pleaded
This law suit concerns a series of events alleged to have taken place at the NYPD Police Academy over the one month period from July 16, 1984 to August 20, 1984 in which Watts underwent police training as a probationary officer. Plaintiff contends that during that training she was subjected to several incidents of sexual harassment, primarily at the hands of a Police Academy instructor, Officer Ronald F. Casey ("Casey"), and a fellow probationary officer, Officer Flowers ("Flowers"), who was a classmate of Watts at the Academy.
The first incident occurred two weeks into Watts' training, on July 31, 1984, while plaintiff was attending marksmanship class. Casey, one of Watts' marksmanship instructors at the Academy, approached Watts from behind as she was practicing firing her gun, reached around Watts, and grabbed her left breast.[1] Watts repulsed Casey's advance and made it clear that it was unwelcome and offensive to her.
In reaction to Watts' protestations, Casey took a number of actions. That day he told Watt that she would fail her marksmanship test; yelled at her "to bend down further" while she was loading and unloading her gun, indicating that if she did not, he would "kick the shit out of her"; and refused to have her gun sent to the repair shop (although it was later found by another officer to be broken), claiming instead that the problem was that Watts "couldn't shoot". The following day, Casey told Watts that she had "better learn to shoot," and called her "stupid" and "a dumb broad." Watts telephoned the NYPD's Office *102 of Equal Employment Opportunity that day to complain about the verbal (but apparently not the physical) harassment she had been subjected to by Casey. No action was taken by the NYPD respecting Watts' complaint against Casey, according to plaintiff.
The next day, August 2, 1984, while at the Academy, Watts was on two separate occasions assaulted by a classmate, Probationary Officer Flowers. Both times, Flowers grabbed Watts, pulled her up against his body, and told her that he wanted to feel her body and that her body felt good. In both instances, plaintiff struggled to free herself from Flower's grasp and verbally remonstrated against his unwelcome, offensive actions. In the second incident, Watts found it necessary to strike Flowers in the neck with a box of ammunition to gain release from his hold.
As a result of the actions of Casey and Flowers, Watts suffered severe and persistent headaches and stomach pains. On or about August 7, 1984, after consultations with her own doctor and a doctor employed at the NYPD, Watts took sick leave, remaining out of work for one week.
On August 14, 1984, the day she was to return to class, Watts telephoned the NYPD to advise the Department that she was not returning to work because she had been sexually harassed on the job. She was asked to come to the Academy to resign in person. Upon arrival at the Academy, Watts was taken to speak with the Equal Employment Opportunity ("EEO") Coordinator at the Academy. The EEO Coordinator convinced Watts not to resign but rather to file a complaint which Watts proceeded to do. The EEO Coordinator also told Watts that other women who had made similar complaints of sexual harassment at the Academy had all resigned before any investigation occurred and denied Watts' request that she be allowed to change her class schedule so that she would not have to remain near her assailant Flowers. A subsequent request by Watts to change classes was also denied by the NYPD, notwithstanding that there were numerous other classes in which Watts might have been placed.
Following her reporting of incidents of sexual harassment on August 14, 1984, Watts experienced further harassment in the form of verbal attacks and ostracization by her co-workers and supervisors, said to arise from the failure of the NYPD to keep her complaint confidential and to permit her to transfer classes. According to the complaint, a few hours after her meeting with the EEO Coordinator, one of Watts' instructors, a Sergeant Rosen, allegedly remarked to plaintiff, "What a way to go, Watts." Over the next days, Watts was ignored and isolated by her classmates. On August 17, 1984, as Watts walked by Flowers and other male probationary officers, one of them yelled to her that she was a "squealer." The previous day the EEO Coordinator had told Watts that Flowers, after admitting to grabbing her and holding her against his body, had been docked pay and been instructed to stay away from her.
On August 20, 1984 Watts tendered her resignation. In an apparent effort to alter her decision, an NYPD Captain advised her she would be permitted to change her classes if she stayed on. Watts rejected that offer, stating that it came too late, her request to transfer having twice before been refused. At a post-resignation meeting held on August 22, 1984, Watts alleges the Police Department down-played and belittled her charges in order to cover-up the sexual harassment that occurred but which, she states, the NYPD never adequately and seriously investigated.

Discussion
Sexual harassment is a type of sex discrimination forbidden under Title VII. Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Plaintiff asserts her employer violated Title VII by subjecting her to three judicially cognizable forms of sexual harassment: "quid pro quo" harassment, harassment creating a hostile working environment, and harassing conduct compelling her forced resignation. Before evaluating whether Watts' complaint pleads facts sufficient *103 to support one or more of these three theories of Title VII liability against NYPD's motion for judgment on the pleadings, a brief review of the standards governing such motions is warranted.

A. Standards Governing Motion for Judgment on the Pleadings

The standard for determining whether to grant a motion for judgment on the pleadings under Rule 12(c), Fed.R.Civ.P., is the same as that governing a motion to dismiss made under Rule 12(b)(6). George C. Frey Ready-Mixed Concrete Inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 553 (2d Cir.1977). In deciding the merits of the motion, all material allegations composing the factual predicate of the action are taken as true, for the court's task is to "assess the legal feasibility of the complaint, not assay the weight of the evidence which might be offered in support thereof." Ryder Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d 774 (2d Cir. 1984). Thus, "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief," NYPD's motion for judgment on the pleadings must be denied. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957). Accord, Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984), quoted in H.J. Inc. v. Northwestern Bell Tel. Co., ___ U.S. ___, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989).

B. The Quid Pro Quo Theory

A claim for quid pro quo sexual harassment arises when an employer (or one exercising authority delegated by an employer) makes a decision affecting an employee's job status based upon the employee's willingness or refusal to submit to sexually harassing conduct. See Henson v. City of Dundee, 682 F.2d 897, 909, 911 n. 22 (11th Cir.1982); Christoforou v. Ryder Truck Rental, Inc., 668 F.Supp. 294, 302, 304 (S.D.N.Y.1987); Neville v. Taft Broadcasting Co., 42 Fair Empl.Prac.Cas. (BNA) 1314, 1316, 1987 WL 9638 (W.D.N.Y.1987); EEOC Guidelines on Sexual Harassment, 29 C.F.R. § 1604.11(a)(2). To constitute prohibited sex-based discrimination such a decision must affect "tangible aspects of the employee's compensation, terms, conditions, or privileges of employment." Henson, 682 F.2d at 909. See 42 U.S.C. § 2000e-2(a)(1).
NYPD does not challenge that Watts' complaint adequately alleges conduct that amounted to sexual harassment. It does dispute that the complaint points to any tangible adverse employment decision made by NYPD following Watts' rejection of the unwelcome sexual advances of Casey. On that basis, NYPD urges that Watts fails to state a ground for relief under the quid pro quo theory.
To establish an employer's potential liability under the quid pro quo theory of sexual harassment, an employee must plead facts showing that as a result of her response to the harassing conduct, she "was deprived of a job benefit which she was otherwise qualified to receive" or in some other way sustained a "tangible job detriment." Henson, 682 F.2d at 909. Watts argues that such a discriminatory reprisal on the part of her employer was evinced by Casey's refusal to send her gun to be repaired and his threat to fail her on the upcoming marksmanship test, which he had responsibility to grade.[2] NYPD argues *104 that neither allegation constitutes an action which produced any substantial employment consequence for Watts, observing that plaintiff does not allege that her gun was not sent for repair or that Casey in fact failed her on the marksmanship test.
As pleaded by Watts, Casey's employment decisions did not cause her to suffer quid pro quo discrimination of a form or severity typically held cognizable under Title VII. See, e.g., Bundy v. Jackson, 641 F.2d 934, 953 (D.C.Cir.1981) (denial of promotion); Henson, 682 F.2d at 906 (denial of admission to training program); Christoforou, 668 F.Supp. at 302 (job termination); Priest v. Rotary, 634 F.Supp. 571, 581 (N.D.Cal.1986) (withholding of choice assignments). Watts' rejection of Casey's unwelcome advances was countered by grossly inappropriate behavior on his part that included a threat of a tangible employment repercussion (failure of the marksmanship test) that would likely be cognizable had it been carried out. Watts, however, does not contend that any such repercussion ever arose (apart from the short delay in the repair of her gun, which the court deems to be a job detriment somewhat less than tangible). Absent the pleading of facts showing an actual, rather than threatened, employment decision resulting in denial of a tangible employment benefit, Watts fails to state a claim of sexual harassment premised upon the quid pro quo theory.[3]

C. The Hostile Environment Theory

1. The Requirement that Harassing Behavior Be Severe or Pervasive

To state a Title VII claim against an employer for hostile environment sexual harassment, a plaintiff must allege offensive behavior "sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor Savings Bank v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (quoting Henson, 682 F.2d at 904). See also Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir.1986) (applying Henson standard to evaluate racially hostile atmosphere); Lehtinen v. Bill Communications, Inc., 1989 WL 38130, 1989 U.S. Dis. LEXIS 3707 (S.D. N.Y.1989) (evaluating whether working environment is poisoned by sexual harassment); Bennett v. New York City Dep't of Corrections, 705 F.Supp. 979, 984 (S.D.N. Y.1989) (same); Carrero v. New York City Housing Authority, 668 F.Supp. 196, 201 (S.D.N.Y.1987) (same).
Whether conduct reaches that threshold of severity or pervasiveness is a determination that must be based on the "totality of the circumstances," which, as pleaded, must promise more than minor "isolated incidents" or "casual comments" that express harassment or hostility. Snell, 782 F.2d at 1103. If the allegations of the complaint, read in the light most favorable to the plaintiff, suggest that a reasonable person facing the same circumstances would encounter a workplace environment hostile and offensive enough to adversely affect their well-being or work performance, dismissal on the pleadings is inappropriate. Cf. Bennett, 705 F.Supp. at 984 (employing reasonable person standard in denying defendant summary judgment on hostile environment claims); Barbetta v. Chemlawn Services Corp., 669 F.Supp. 569, 573 (W.D.N.Y.1987) (same). See also, Note, Sexual Harassment Claims of Abusive Work Environment Under Title VII, 87 Harv.L.Rev. 1449, 1458-59 (1984) (advocating reasonable victim standard).
Defendant urges dismissal on the ground that Watts' complaint fails to allege harassing behavior adequate to evince a *105 hostile environment. Pointing to decisional law holding that a plaintiff may not rely on "trivial events and `sporadic conversation'" to establish pervasiveness, see Christoforou, 668 F.Supp. at 301 (quoting Snell, 782 F.2d at 1103) and Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir.1987), NYPD argues that "[w]hat is most conspicuous about plaintiff's allegations is their paucity and the extremely brief period of time during which the alleged incidents occurred." Apparently, NYPD hopes to elide the significance of the abusive physical attacks visited upon Watts at her workplace by stressing the concededly short period in which that offensive behavior occurred.
That effort runs counter to the Supreme Court's standard in Vinson, which defendant erroneously denominates the "severe and pervasive test" (Reply Memorandum at 9, citing Vinson, 477 U.S. at 67, 106 S.Ct. at 2405) (emphasis added). What Vinson in fact requires a plaintiff to show is victimization by offensive conduct "sufficiently severe or pervasive" to render her working environment hostile. Id. In speaking of pervasiveness, the Supreme Court recognized, as has the Second Circuit, that occasional or isolated utterances of offensive epithets, although repugnant, do not "affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." Id. (citing Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir.1972); see also Snell, 782 F.2d at 1103; Lopez, 831 F.2d at 1189-90 (applying pervasiveness prong of atmosphere test). In speaking disjunctively of the severity of harassment, however, Vinson equally teaches that conduct less pervasive, but more offensive in form and effect, than slurs and epithets can so poison a working environment as to render it abusive. Physical assaults of a sexual nature obviously constitute incidents that tend to satisfy this criterion of severity.
Watts has pleaded that she was sexually assaulted by a co-worker and a supervisor, at her workplace, on two different occasions. These allegations, if true, bear little resemblance to the "trivial events" or "casual comments" adverted to in the case law cited by defendant.[4] The severity of the conduct Watts has alleged plainly precludes dismissal of plaintiff's complaint for failure to plead sexual harassment of sufficient pervasiveness.
What NYPD in effect maintains is that no reasonable employee would find her work environment abusive or her working conditions substantially altered if, shortly after beginning work on a probationary basis, she endured two sexual assaults within a three day period (one committed by a supervising instructor who thereafter threatened to fail her on an exam), and then suffered further verbal harassment and ostracization on the part of co-workers and another supervising instructor, owing to her having reported to her employer certain of the prior harassing behavior. The legal stance advanced by defendant mocks Title VII's promise to "afford[] employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." Vinson, 477 U.S. at 65, 106 S.Ct. at 2404. The court declines to *106 adopt it.[5]

2. The Requirement of Employer Liability

Watts has sued her former employer NYPD, not Officer Casey, Flowers or any of the other policemen who are alleged to have committed acts which poisoned the working environment at the Police Academy. NYPD urges dismissal of the action on the ground that Watts has not pleaded facts that make the Police Department responsible, as employer, for the harassing acts of its employees, assuming those acts did produce a hostile environment. The law of employers' Title VII liability for hostile environments, while ever evolving, has acquired a contour clear enough to determine that NYPD cannot be dismissed on the pleadings on this ground.
Vinson approached, but did not decide, the issue of employer liability posed here. Rejecting a blanket rule that employers are always liable for sexual harassment committed by their supervisors or that employers are always insulated from liability absent notice, the Supreme Court advised judges to "look to agency principles for guidance in this area." Vinson, 477 U.S. at 72, 106 S.Ct. at 2408; see also Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir.1987) (citing agency approach of Vinson); Carrero v. New York City Housing Authority, 668 F.Supp. 196, 203 (S.D.N.Y. 1987) (same).
In Carrero, this court noted that under agency law, an employer is generally liable for those acts of its employees committed in the scope of their employment and, under certain delineated circumstances, may be liable for employee acts taken outside the scope of employment. Id. (citing Restatement (Second) of Agency §§ 219(1), 219(2)(b) (1958)). The latter circumstances encompass the situation in which an employer who is aware of sexual harassment in the workplace acts negligently or recklessly by failing to take "reasonable steps to eliminate such offensive conduct." Lopez, 831 F.2d at 1189; see also Snell v. Suffolk County, 782 F.2d at 1104 (employer with knowledge of racially combative atmosphere in workplace has duty to take remedial steps); Carrero, 668 F.Supp. at 202-03 (agency principles require employer to investigate charges of sexual harassment).[6]
*107 Applying these principles, Watts' complaint states a claim against NYPD as employer if the allegations therein would, if proved, allow a factfinder to conclude either that NYPD was aware of sexually harassing conduct but failed to take adequate remedial measures or, that the officers who engaged in such conduct acted within the scope, or apparent scope, of their employment. Plaintiff at a minimum has met the former burden. The court therefore need not consider at this juncture whether the harassing acts alleged were undertaken with actual authority or were facilitated by the existence of the agency relation.
The complaint states that on August 1, 1989, Watts complained to the NYPD's Equal Employment Opportunity Office of Casey's verbal harassment. The complaint also alleges that no action was ever taken by the NYPD respecting that complaint. It therefore must be assumed at this stage of the litigation that the NYPD did not bother to investigate Watts' initial charge of sexual harassment. Watts' further alleges that NYPD failed to respond reasonably to her second complaint of harassment, which she lodged against her classmate Flowers on August 14, 1989. She contends in this regard that (1) despite Flowers' admission to the NYPD that he had physically and sexually harassed Watts, NYPD twice denied her request to be assigned to one of the numerous classes separate from Flowers, thereby forcing her to remain for several days in the same class as her attacker; (2) NYPD failed to keep her complaint against Flowers confidential, a lapse that caused Watts to be subjected to further verbal harassment and isolation by classmates and a supervisory officer, who regarded her as a "squealer"; and (3) NYPD's subsequent investigation of her complaints following her resignation was not seriously undertaken and was intended to cover up its employees acts of harassment.
Assuming the truth of these allegations, one cannot safely conclude that NYPD satisfied its legal obligation under Title VII to take reasonable steps to remedy the hostile atmosphere created by its employees' discriminatory acts, promptly upon being made aware of them. Although the complaint acknowledges that defendant did dock Flowers' pay and advised him to stay away from Watts, plaintiff's other allegations, if proven, might well establish that NYPD did not come close to "exhaust[ing] the field of reasonable and feasible actions" it might have taken to cleanse Watts' working environment. Snell v. Suffolk County, 782 F.2d 1094 at 1104 (2d Cir.1986); see also Bennett v. New York Dept. of Corrections, 705 F.Supp. 979, 988 (S.D.N.Y.1989) (rejecting summary judgment where there was "some evidence" that "officials did not react swiftly and effectively to quell sexual harassment brought to their attention" and "did not take reasonable measures to enforce workable anti-harassment policies with enough speed").
NYPD nevertheless argues that it was absolved of any duty to investigate the charge lodged against Officer Casey (or take any other remedial action) because after that charge was made, Casey did not commit any further offensive acts against Watts. It is true that an employer is not automatically liable for every act of sexual harassment committed by its employees. See Vinson, 477 U.S. at 72, 106 S.Ct. at 2408. But once an employer is apprised of the occurrence of such offensive conduct in the workplace, Title VII does impose an affirmative duty on that employer to investigate charges, e.g., Bundy v. Jackson, 641 F.2d 934, 943, 947 (D.C.Cir.1981) (Title VII liability where employer had notice of harassment but did "virtually nothing to ... even investigate"); Carrero, 668 F.Supp. at 203 (duty to investigate); Mun- *108 ford v. James T. Barnes & Co., 441 F.Supp. 459, 466 (E.D.Mich.1977) (same), and to take prompt and appropriate corrective action. See Snell v. Suffolk County, 782 F.2d 1094, 1104 (2d Cir.1986); Lipsett v. University of Puerto Rico, 864 F.2d 881, 901 & n. 22 (1st Cir.1988) (citing EEOC Guideline set forth at 29 C.F.R. § 1604.11(d)); Barrett v. Omaha Nat'l Bank, 726 F.2d 424, 427 (8th Cir.1984); Tomkins v. Public Service Electric & Gas Co., 568 F.2d 1044, 1049 (3d Cir.1977).
In short, once an employer learns of claims of discriminatory acts, it cannot rest idly on hopes that such acts will not be repeated, whether by the same employee or any other. It has an obligation to investigate whether acts conducive to the creation of an atmosphere of hostility did in fact occur and, if so, it must attempt to dispel workplace hostility by taking prompt remedial steps. For that reason, the fact that Watts, after apprising NYPD of concerns about harassment by one officer, instead became the victim of harassment by another, does not provide NYPD an absolute shield against its duty to take reasonable measures to enforce the federal policy that sexual harassment will not be tolerated in the workplace. Title VII simply does not permit an employer to "stand by and allow an employee to be subjected to a course of [sexual] ... harassment by co-workers." DeGrace v. Rumsfeld, 614 F.2d 796, 803 (1st Cir.1980).[7]
NYPD, of course, may yet establish that in furtherance of plaintiff's right to work in an environment free of sexual harassment, it conducted a prompt and thorough investigation of all of Watts' charges, appropriately disciplined any offenders and issued directives to its employees which both expressed its strong disapproval of sexually harassing conduct and explained the sanctions NYPD imposes upon such conduct. Cf. Barrett v. Omaha Nat'l Bank, 726 F.2d 424, 426-427 (8th Cir.1984) (charges promptly and fully investigated and guilty employee placed on probation subject to discharge for further misconduct) and Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309 (5th Cir.1987) (victim assured within hours of harassing incident that she would not need to work further with perpetrator) with Snell, 782 F.2d at 1104-05 (employer failed to investigate or act upon many instances of harassment and did not adequately "let it be known" that harassment would not be tolerated). It may also develop that Watts cannot fully support the allegations set forth in her complaint. Such eventualities necessarily await further proceedings, however, since plaintiff has pleaded facts sufficient to state a Title VII hostile environment claim against NYPD under the standard for employer liability set forth in Snell.

D. The Constructive Discharge Theory

Watts' final sexual harassment theory is that her resignation from NYPD actually was a constructive discharge forced upon her by the intolerable conditions she faced at her workplace. In this circuit,
"[a] constructive discharge occurs when the employer, rather than acting directly, `deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" [Pena v. Brattleboro Retreat, 702 F.2d 322, 325-26 (2d Cir.1983)] (quoting Young v. Southwestern Sav. *109 and Loan Assn, 509 F.2d 140, 144 (5th Cir.1975). To find that an employee's resignation amounted to a constructive discharge, "`the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" Id. (quoting Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir.1977)).
Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir.1987); see also Martin v. Citibank, N.A., 762 F.2d 212, 221 (2d Cir.1985) (same).
Plaintiff's theory of constructive discharge thus can survive defendant's motion for judgment on the pleadings if Watts has alleged facts sufficient to establish that (1) her working conditions at NYPD were so intolerable that a reasonable person would have resigned under the circumstances and (2) NYPD deliberately made those working conditions intolerable. She has failed to do so. Read in a light most favorable to her, Watts' complaint fails to satisfy the Second Circuit's stringent test, which requires that the employer act with deliberation.[8]
On the assumption that Watts has pleaded facts adequate to establish working conditions so difficult that a reasonable person in her shoes would have felt compelled to resign, her allegations nevertheless fail to demonstrate that NYPD intended that her working environment be so intolerable or that it sought to force her to resign. The complaint states that when Watts first notified NYPD that she was resigning due to sexual harassment, defendant's Equal Employment Opportunity Coordinator persuaded Watts not to quit but instead to file a complaint. Six days' later, when Watts once more stated her intention to resign, the complaint again indicates NYPD sought to prevent that event, by acceding to Watts' prior request for a change in her class schedule. Watts rejected that remedy, advising the captain who proposed that she stick with her job that "it was too late."
It is true that Watts has adequately pleaded other facts that show that in certain respects the NYPD failed to respond to her complaints of abuse. Those serious allegations, if proven, could establish that NYPD acted negligently and unreasonably in fulfilling its obligations to dispel hostility in the workplace, and might even allow a factfinder to conclude that a person subjected to the harassment Watts faced would reasonably feel compelled to resign. They do not suffice, however, to raise an inference that NYPD deliberately acted (or refrained from acting) in order to make Watts' working conditions so intolerable as to force her resignation, or that NYPD otherwise sought to induce Watts to leave.[9] *110 Accordingly, Watts' allegations do not permit her to pursue an action against NYPD predicated on the theory of constructive discharge.

Conclusion
For the reasons set forth above, the defendant's motion for judgment on the pleadings is denied. Watts has pleaded facts sufficient to maintain a Title VII hostile work environment claim against the NYPD.
It is so ordered.
NOTES
[1] For purposes of this motion for judgment on the pleadings, the veracity of this and all other allegations contained in the amended complaint is assumed.
[2] Watts does not rely on the conduct of any person other than Casey to support her quid pro quo theory. With respect to his conduct, plaintiff further alleges that Casey's verbal abuse and threats of physical abuse, which followed upon her rejection of his unwelcome advances, caused her to suffer a tangible job detriment. Those actions, while a consequence of Watts' refusal to submit silently to sexually harassing conduct, cannot accurately be described as being in the nature of a decision of an employer (or employer's delegatee) respecting the employee's job status. Rather, such abuse constitutes a form of continuing sex-based workplace harassment. For that reason it does not advance the quid pro quo theory, although such harassment certainly is relevant to Watts' "hostile environment" claim, discussed infra, which alleges that sufferance of such abuse became a term or condition of her employment. See Vinson, 477 U.S. at 67, 106 S.Ct. at 2405 (pervasive harassment may affect or alter conditions of employment within meaning of Title VII).
[3] Unexecuted threats of sex discrimination are of course cognizable as evidence of harassment creating an offensive work environment, in that, like verbal or physical abuse that results in no direct economic detriment, the endurance of such threats may become a feature or condition of work that causes psychological injury. Conduct causing such injuries is actionable under an "hostile environment" theory. See Vinson, 477 U.S. at 64, 106 S.Ct. at 2404. In contrast, the quid pro quo theory demands that the plaintiff show some economic injury arising from employer conduct denying her a concrete employment benefit, such as job training or a promotion, that other individuals who were no more qualified enjoyed.
[4] None of the authority relied on by defendant even suggests that on the facts alleged in this case, a motion for judgment on the pleadings would be appropriate. Lopez a hostile environment race case decided by the Second Circuit, involved ethnic epithets which the Court held "were few in number and occurred over a short period of time." Lopez 831 F.2d at 1189. There is no indication in Lopez that the plaintiff-employee suffered from one or more physical assaults. For the same reason, defendant is not aided by facilely comparing the sexual attacks Watts must be presumed to have undergone with "crude joke[s] or sexually explicit remark[s] made on the job by employees...." Downes v. F.A.A., 775 F.2d 288, 293 (Fed.Cir. 1985). Nor is the Southern District case, Christoforou, helpful to defendant, although it at least did involve assertions of physical harassment. Christoforou was decided not on a dispositive pre-trial motion, but after full trial to the judge, who specifically discredited much of the plaintiff's testimony concerning the physical advances putatively made by her employer while accepting plaintiff's testimony that her employer's unwanted attentions did not interfere with her ability to do her job. Christoforou, 668 F.Supp. at 299, 301. Here, Watts' allegations, which include assertions of physical assault which interfered with her job attendance, must be taken as true.
[5] In view of the pleadings, it is unnecessary to decide whether "a single, unusually severe incident of harassment [is] ... sufficient to constitute a Title VII violation," as both plaintiff and the October 25, 1988 Guidance Memorandum of the EEOC suggest. See Guidance Memorandum, at 15; see also Barrett v. Omaha National Bank, 584 F.Supp. 22 (D.Neb.1983), aff'd, 726 F.2d 424 (8th Cir.1984); Gilardi v. Schroeder, 672 F.Supp. 1043 (N.D.Ill.1986), aff'd, 833 F.2d 1226 (7th Cir.1987). Plaintiff has pleaded she was the victim of several incidents of physical and verbal harassment, occurring in a concentrated, rather than sporadic, manner. Moreover, liberally construed as it must be, the complaint further alleges that other female employees of the NYPD experienced sexual harassment and sexual abuse in the Police Academy work environment. Evidence supporting that assertion might be probative of a general work atmosphere hostile toward women, including Watts. See Lehtinen v. Bill Communications, 1989 WL 38130, 1989 U.S. Dist. LEXIS 3707 (S.D.N.Y. 1989); Hall v. Gus Construction Co., Inc., 842 F.2d 1010, 1015 (8th Cir.1988); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415-16 (10th Cir. 1987); Vinson v. Taylor, 753 F.2d 141 (D.C.Cir. 1985), aff'd in part and rev'd in part, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). For these reasons, this is not a case presenting a single, isolated instance of physical harassment.
[6] The circumstances under which an employer may incur Title VII liability under agency principles for sexual harassing acts committed outside the scope of employment may also include the situation where the perpetrator of such acts "was aided in accomplishing [them] by the existence of the agency relation." Restatement (Second) of Agency § 219(2)(d) (1958). That possibility is presented when a supervisor uses apparent, although not actual, authority entrusted to him by his employer to harass sexually an employee over whom he has been given some supervisory power. Such malevolent conduct, undertaken for the supervisor's own purposes, will likely be outside the scope of employment. See Restatement (Second) of Agency §§ 228(1), 230; Carrero, 668 F.Supp. at 202. Nevertheless, if the conduct is accomplished by means furnished to the supervisor by his employer (such as the supervisor's influence or control over hiring, job performance evaluations, work assignments, or promotions), and the employer has not put in place strong policies and procedures that effectively belie the appearance of such authority, agency law will impute such conduct to the employer as the source of the abused apparent authority, notwithstanding absence of notice. See Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1558-60 (11th Cir.1987) (applying Restatement agency liability principles to hostile working environment claim); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1418 (10th Cir.1987) (same); Holtzman & Trelz, Recent Developments in the Law of Sexual Harassment: Abusive Environment Claims after Meritor Savings Bank v. Vinson, 31 St. Louis U.L.J. 239 (1987); Note, Sexual Harassment and Title VII, 76 U.Mich.L.Rev. 1007, 1026-29 (1978). But cf. Lipsett v. University of Puerto Rico, 864 F.2d 881, 900-01 & n. 21 (1st Cir.1988) (rejecting application of Restatement § 209(2)(d) in favor of notice requirement).
[7] That principle applies with particular force when an employer has received similar complaints of sexual harassment from other female employees, as is here alleged. The above discussion of an employer's affirmative Title VII duties also addresses NYPD's parallel assertion that it has a "complete and absolute defense" to possible liability for its failure promptly to transfer Watts out of classes she shared with Flowers following his attacks because, as it turned out, Flowers did not perpetrate any further physical attacks upon Watts. Such ex post analysis may bear upon the gravity of the harm inflicted on the person who is the subject of harassment. It does not, however, abrogate an employer's duty to take steps to dissipate an atmosphere of hostility created by prior acts of which it has knowledge nor does it establish that the remedial steps actually taken were reasonable ones. The latter judgment must, of course, be evaluated from the standpoint of the responsible employer in light of facts available at the time of the decision.
[8] This circuit has been identified as one of the few that has adopted a constructive discharge test based, at least in part, "on an inquiry into the motive of the employer." Levendos v. Stern Entertainment, Inc., 860 F.2d 1227, 1230 (3d Cir.1988) (citing, as evidence, Martin v. Citibank, N.A., 762 F.2d 212, 221 (2d Cir.1985), and as fellow-travelers, the Eighth Circuit, see Johnson v. Bunny Bread, Co., 646 F.2d 1250, 1256 (1981) ("employer's actions must have been taken with the intention of forcing the employee to quit.") and the Tenth Circuit, see Coe v. Yellow Freight System, Inc., 646 F.2d 444, 454 (must be deliberate effort to make things difficult for employee). According to the Levendos court, most of the other circuits, including the First, Third, Fifth, Sixth, Ninth and D.C., have instead "focussed on the impact of an employer's actions, whether deliberate or not, upon a `reasonable' employee." Levendos, 860 F.2d at 1230 (citing cases). See also Note, Choosing a Standard for Constructive Discharge Litigation, 71 Cornell L.Rev. 587 (1986).

This court adheres to the stricter, Second Circuit standard here in view of its recent application by our Court of Appeals in another Title VII constructive discharge case. See Lopez, 831 F.2d at 1188 (discharge based on ethnicity). While there may be reasons why a different standard should govern constructive discharges predicated upon a working environment rendered hostile by sexual harassment, counsel for plaintiff has not suggested any.
[9] The cases cited by Watts to support her constructive discharge claim are in this respect unhelpful to her. In each instance the plaintiff, unlike Watts, had alleged that the employer had taken some action directly threatening (or actually imposing) a change in the employee's job status. In Lopez, 831 F.2d at 1186-88, the plaintiff asserted that his employer's division manager had once suggested that he resign and, later, after he had been placed on a 90 day probation period, the regional director of the company told him that he would be fired at the end of his probation period regardless of his performance. Not surprisingly, the Second Circuit held that the latter statement might alone suffice to establish constructive discharge. In Levendos, 860 F.2d at 1228, the business owner and its managers were accused, among other things, of telling plaintiff, a female maitre'd, that she would not last long at that position, that she did not fit the mold because she was a woman, and of seeking to find a male to replace her. Finally, in Goss v. Exxon Office Systems Co., 747 F.2d 885, 888 (3d Cir.1984), the employer was found to have assigned the plaintiff's lucrative sales territory to a male representative despite her successful past performance, resulting in a cut in compensation, and to have greeted her attempts to pursue internal grievance procedures with an ultimatum that she either accept the new assignment or resign. In contrast, Watts' complaint acknowledges that she was encouraged by her employer to continue with her training at the Police Academy, rather than resign, and does not assert that her employer ever threatened to fire, replace, or demote her.